*Benjamin Caleb Trott v. State of* Maryland, Misc. No. 9, September Term, 2020, Opinion by Booth, J.

**CRIMINAL PROCEDURE – FOURTH AMENDMENT – SEARCH AND SEIZURE – ANONYMOUS 911 CALL REPORTING DRUNK DRIVING – REASONABLE SUSPICION –** The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. For an investigatory stop to be constitutional under the Fourth Amendment, the police officer must have reasonable suspicion that the person stopped is engaging in criminal activity. The Court of Appeals held that the investigatory stop in this case satisfied the Fourth Amendment. Considering the totality of the circumstances, the officers had reasonable suspicion to suspect that the defendant was engaged in drunk driving. The anonymous 911 call had sufficient indicia of reliability— the tipster alleging the drunk driving provided the make, model, and license plate of the vehicle, as well as its location. The police arrived within minutes of receiving the call and observed the vehicle parked at a liquor store around 11:30 p.m. with the engine running. The stop was reasonable given the nature of the criminal activity—drunk driving, with its attendant imminent danger to the public, as well as the minimal and non-intrusive nature of the stop.

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 9

September Term, 2020

BENJAMIN CALEB TROTT

v.

STATE OF MARYLAND

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

Opinion by Booth, J.

Filed: April 23, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

It is not uncommon that the Fourth Amendment puts into tension two fundamental pillars of good government: the right of the people to be free from unreasonable government intrusion and the government's interest in protecting the people from dangerous criminal activity.  For decades, Maryland has recognized a compelling public interest in controlling and preventing drunk driving.[1]  Although significant efforts to combat drunk driving have reduced fatalities in recent years, 167 people in Maryland died in alcohol-impaired driving incidents in 2019, accounting for about one-third of the total traffic deaths in the State.[2]

In this case, we are asked to navigate the tension between law enforcement's ability to investigate an anonymous 911 tip that reported drunk driving and the parameters of the Fourth Amendment.  In response to an anonymous 911 call placed close to 11:30 p.m. on a Friday night that provided the specific location and license plate of a vehicle driven by a possibly intoxicated driver, within minutes of the call, the responding police officer located the vehicle in a parking lot of a liquor store, and knocked on the window of the running car to investigate.  The driver, Benjamin Caleb Trott, rolled down his window, smelled of alcohol, and admitted to having had multiple drinks.  Mr. Trott also stated that his driver's

---

[1] *See Little v. State*, 300 Md. 485, 504 (1984) ("The magnitude of the problem created by intoxicated motorists cannot be exaggerated.").

[2] Nat'l Highway Traffic Safety Admin., U.S. Dep't of Transp., *Traffic Safety Facts Research Note: Overview of Motor Vehicle Crashes in 2019*, at 13 (2020), https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813060 [https://perma.cc/AL5K-HKTG].

license was suspended and revoked. After Mr. Trott was unable to successfully complete a field sobriety test, the police arrested him.

Following the denial of his motion to suppress, Mr. Trott entered a plea of not guilty on an agreed statement of facts to one count of driving while impaired. The Circuit Court for Anne Arundel County found Mr. Trott guilty and sentenced him to a three-year term of incarceration, with three years suspended, and a three-year term of supervised probation.

Mr. Trott noted a timely appeal. After the parties submitted briefs, the Court of Special Appeals filed a certification pursuant to Maryland Rule 8-304, requesting that this Court determine whether the circuit court erred in denying Mr. Trott's motion to suppress.[3] We granted *certiorari* to consider the parameters of the Fourth Amendment in the context of a 911 call reporting drunk driving. For the reasons explained below, we hold that, under the totality of the facts presented in this case, the police had reasonable suspicion to conduct a brief investigatory detention of Mr. Trott, and this stop did not violate the Fourth Amendment. We affirm the circuit court's denial of the motion to suppress.

---

[3] The question presented in the Court of Special Appeals certification was:

> Did the circuit court err in finding that a police officer had reasonable suspicion to engage in an encounter with appellant based upon the police dispatcher's information conveyed to him over his police radio, following a 911 call, stating "intoxicated driver at 5823 Deale Churchton Road," and indicating further facts limited to the color of the vehicle, Maryland tag number, Maryland registration number, and that the vehicle was in a parking lot?

In our order granting certification, pursuant to Maryland Rule 8-304(c)(2), we modified the question of law to state: "Did the circuit court err in denying Appellant's motion to suppress?"

2

# I.

## Factual and Procedural Background

After entering a plea of not guilty, Mr. Trott filed a motion to suppress, arguing that Corporal Michael Cooper lacked a reasonable, articulable suspicion to justify the stop because it was based solely on a dispatcher's account of an anonymous tip, and that the totality of the circumstances as alleged did not support the investigative stop. Corporal Cooper of the Anne Arundel Police Department was the sole witness at the suppression hearing. The relevant facts elicited at the hearing are not in dispute.

### A.     *The Suppression Hearing*

At the suppression hearing, Corporal Cooper testified to the following facts. Around 11:30 p.m. on the night of Friday, December 4, 2015, Corporal Cooper received a report from a dispatcher of an intoxicated driver at a specific location in Anne Arundel County. The tip provided the color of the vehicle and the license plate number. Corporal Cooper arrived at the address within two to eight minutes. When he arrived at the location, accompanied by another officer, he observed a silver Honda CR-V parked in front of Captain Kidd's liquor store, with the same Maryland license plate number that was provided to him by the dispatcher. Mr. Trott was in the driver's seat and his girlfriend was seated in the front passenger seat. The car was parked, the keys were in the ignition, and the engine was running. Corporal Cooper pulled into the parking lot and parked his cruiser approximately ten to fifteen feet behind the vehicle, at which time he activated his emergency lights, but not his siren. Both officers approached the car, one to the passenger's side and one to the driver's side.

3

Corporal Cooper knocked on the driver's side window and asked Mr. Trott to roll down his window. Mr. Trott did not immediately do so because he appeared to be unfamiliar with the window controls. After Corporal Cooper asked Mr. Trott for his license and registration, Mr. Trott admitted that his license was suspended, and his driver's license was revoked. During the conversation, Corporal Cooper could smell a "strong odor" of alcohol on Mr. Trott's breath. Mr. Trott acknowledged that he had consumed two beers and a shot, explaining that he was more sober than his girlfriend, who was also in the car. Corporal Cooper asked Mr. Trott to step out of the vehicle. After an unsuccessful field sobriety test, Mr. Trott was arrested.

Following Corporal Cooper's testimony and arguments of counsel, the circuit court orally delivered its ruling denying Mr. Trott's motion to suppress, stating "[w]ell, viewing what you gentlemen have submitted in writing and your arguments along with the testimony of Officer Cooper, I find that the circumstances were sufficient to support the stop conducted by Officer Cooper and therefore the [m]otion is denied."

### B. Additional Proceedings

After the circuit court denied Mr. Trott's motion to suppress, he entered a plea of not guilty on an agreed statement of facts to one count of driving while impaired. The circuit court convicted Mr. Trott of driving while impaired by alcohol, and sentenced him to a three-year term of incarceration, with three years suspended, and three years of supervised probation.

Mr. Trott timely appealed the circuit court's decision to the Court of Special Appeals. The sole issue presented to the intermediate appellate court was whether the

4

circuit court erred in denying Mr. Trott's motion to suppress. After considering the issue on brief, the Court of Special Appeals filed a certification pursuant to Maryland Rule 8-304. In its certification, the intermediate appellate court observed that this case presents "an important question of public policy" balancing the interests of individual privacy protected by the Fourth Amendment and against the inherent danger to the public arising from driving while intoxicated, in the context of an anonymous 911 call reporting such alleged behavior. We granted the certification, pursuant to Maryland Rule 8-304(c)(3), and issued a writ of *certiorari* that included the entire action.

## II.

### Standard of Review

Our review of a circuit court's denial of a motion to suppress evidence under the Fourth Amendment is limited to the information contained in the record of the suppression hearing. *Pacheco v. State*, 465 Md. 311, 319 (2019). We review the facts found by the circuit court in the light most favorable to the prevailing party, in this case, the State. *Id.* We accept the circuit court's findings of fact "unless they are clearly erroneous, but we review *de novo* the court's application of the law to its findings of fact." *Id.* (citation and internal quotations omitted). When a party raises a constitutional challenge to a search or seizure, we undertake an "independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case." *Grant v. State*, 449 Md. 1, 14–15 (2016) (quoting *State v. Wallace*, 372 Md. 137, 144 (2002)).

5

## Discussion

The Fourth Amendment to the United States Constitution[4] protects "against unreasonable searches and seizures[.]" U.S. Const. amend. IV "The exclusion of evidence obtained in violation of these provisions is an essential part of the Fourth Amendment protections." *Swift v. State*, 393 Md. 139, 149 (2006); *see also Mapp v. Ohio*, 367 U.S. 643, 655–56 (1961). In determining whether a search or seizure is lawful, "[t]he touchstone of our analysis under the Fourth Amendment is always the 'reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Recognizing that the constitutional gauge for purposes of Fourth Amendment analysis is "reasonableness," we have explained that "'[w]hat is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *Lewis v. State*, 470 Md. 1, 18 (2020) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). "Whether a particular warrantless action on the part of the police is reasonable under the Fourth Amendment depends on a balance between

---

[4] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Pacheco*, 465 Md. at 321 (internal quotations omitted).

In analyzing the reasonableness of warrantless encounters between the police and members of the public, we have generally compartmentalized these interactions into three categories based upon the level of intrusiveness of the police-citizen contact: an arrest; an investigatory stop; and a consensual encounter. *See Swift*, 393 Md. at 149–51. An arrest— the first and most intrusive category—"requires probable cause to believe that a person has committed or is committing a crime." *Id.* (citations omitted). This case involves the application of the intermediate tier, known as the *Terry* stop,[5] or investigatory stop, which is less intrusive than a more formal custodial arrest, and correspondingly, requires a less demanding level of suspicion than probable cause.[6] *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). To satisfy the Fourth Amendment, a *Terry* stop "must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual." *Swift*, 393 Md. at 150 (citing *Berkemer*

---

[5] The intermediate level of police-citizen encounter commonly referred to as "*Terry* stop," derives its name from the seminal "stop and frisk" case of *Terry v. Ohio*, 392 U.S. 1 (1968).

[6] "The least intrusive police-citizen contact, a consensual encounter, involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact." *Swift v. State*, 393 Md. 139, 151 (2006). In its supplemental brief filed with this Court, the State concedes that, under the circumstances presented in this case— where the officers parked the cruiser ten to fifteen feet behind Mr. Trott's parked car and activated the emergency lights—Mr. Trott was seized when Corporal Cooper approached his car and asked him to roll down his window. Given the State's concession that Mr. Trott was "seized" within the meaning of the Fourth Amendment, the encounter was not consensual and is governed by the reasonable suspicion standard applicable to a *Terry* stop.

7

*v. McCarty*, 468 U.S. 420, 439 (1984)); *Ferris v. State*, 355 Md. 356, 374 n.5 (1999). Generally, an officer has reasonable suspicion to conduct a stop when there is "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also Sizer v. State*, 456 Md. 350, 364 (2017) (explaining that "[r]easonable suspicion exists somewhere between unparticularized suspicions and probable cause").

"There is no standardized litmus test that governs the 'reasonable suspicion' standard," and we have recognized that "any effort to compose one would undoubtedly be futile." *Cartnail v. State*, 359 Md. 272, 286 (2000) (citing *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (explaining that it would be impossible to articulate, with precision, what "reasonable suspicion" means)). The futility in attempting to create such a standard arises from the "myriad factual situations that arise." *Cortez*, 449 U.S. at 417. Like probable cause, the standard for "reasonable suspicion" is intentionally fluid because it "is not readily, or even usefully, reduced to a neat set of legal rules." *Sokolow*, 490 U.S. at 7 (citation and internal quotations omitted). Distilled to its essence, we consider the "totality of the circumstances—the whole picture—" to determine whether "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417–18. The reasonable suspicion standard "is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Cartnail*, 359 Md. at 286 (citing *Ornelas*, 517 U.S. at 695–96). In *Sizer*, we explained that "[t]he reasonable

8

suspicion standard does not allow a law enforcement official to simply assert that innocent conduct was suspicious to him or her. Rather, the officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity." 456 Md. at 365 (internal citations and quotations omitted) (cleaned up). Although reasonable suspicion "requires some minimal level of objective justification for making the stop that amounts to something more than an 'inchoate and unparticularized suspicion or hunch, it does not require proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7 (cleaned up). Accordingly, we have stated that a stop may be upheld based on "a series of acts which could appear naturally innocent if viewed separately" but that "collectively warrant further investigation[.]" *Cartnail*, 359 Md. at 290 (citation omitted); *see also United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.").

On the undisputed facts presented at the suppression hearing, we must determine whether Corporal Cooper had reasonable suspicion necessary to effect a stop of Mr. Trott outside Captain Kidd's liquor store after receiving the information relayed by the 911 caller, under the totality of the circumstances known to the officer at the time of the stop.

Mr. Trott argues that the officers did not have a legal basis to stop and detain him and that the anonymous call cannot support a finding of reasonable suspicion under the facts of this case. He contends that the 911 caller simply referred to an "intoxicated driver," without: any reference as to timing; describing any driving behavior; or providing any basis of personal knowledge. What is missing from the call, he claims, is sufficient indicia of

9

reliability and the caller's basis of knowledge, given that reasonable suspicion requires that a tip be reliable in its assertion of ongoing criminal activity, and not simply its tendency to identify a specific person. Mr. Trott asserts that under the Supreme Court's jurisprudence and in particular, *Navarette*, 572 U.S. 393, the mere reference to an "intoxicated driver" is a "conclusory allegation," which is insufficient to satisfy the reasonable suspicion standard applicable to a lawful investigatory stop for Fourth Amendment purposes. Mr. Trott contends that the Supreme Court's rationale in *Florida v. J.L.*, 529 U.S. 266, 271 (2000) controls, because "[a]ll the police had to go on in this case was a bare report of an unknown, unaccountable informant who neither explained how he knew about the [intoxicated driver] nor supplied any basis for belief he had inside information about the [driver]."

The State argues that Corporal Cooper had reasonable suspicion to stop Mr. Trott because the tip, as relayed by the dispatcher, included specific information to identify the vehicle, as well as the vehicle's precise location, along with the allegation that the driver was intoxicated. According to the State, the Supreme Court's reasoning in *Navarette*— combined with the minimally intrusive nature of the stop of Mr. Trott and the significant imminent danger to the public created by the alleged criminal activity—lead to the conclusion that the stop satisfied the reasonableness requirements of the Fourth Amendment.

Despite the opposing outcomes advanced by Mr. Trott and the State, they agree on one point—that our analysis requires an examination of the Supreme Court's jurisprudence concerning anonymous calls alleging criminal behavior that form the basis for an investigatory stop.

10

### A. *Supreme Court Jurisprudence—Anonymous Tips Providing Reasonable Suspicion for Investigatory Stop*

We start with the premise that reasonable suspicion need not be founded on information observed first-hand by law enforcement and may be "based on information from anonymous tips." *Navarette*, 572 U.S. at 397. Indeed, the Supreme Court has "firmly rejected the argument 'that reasonable cause for an investigative stop can only be based on [an] officer's personal observation, rather than on information supplied by another person.'" *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)) (cleaned up). In determining whether an anonymous tip is sufficient to provide the requisite reasonable suspicion necessary for an investigatory stop, we consider both the "quantity and quality[,]" or degree of reliability of information disclosed in an anonymous tip, "giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work." *Alabama v. White*, 496 U.S. 325, 330 (1990). "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.*

In *White*, the Supreme Court considered whether an anonymous tip, corroborated by independent police work, was sufficient to provide reasonable suspicion to make an investigatory stop. 496 U.S. at 326–27. The tipster told the police that a woman would be leaving an apartment at a particular time, driving to a particular motel in a brown Plymouth station wagon with a broken taillight, and would be transporting cocaine. *Id.* at 327. Based upon the information provided by the tipster, the police officers stopped the station wagon

11

as it neared the motel and found cocaine in the vehicle. *Id.* at 331. The Court held that the officers' corroboration of certain details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity and that the investigative stop therefore did not violate the Fourth Amendment. *Id.*

Although the Court observed that the anonymous tip provided "virtually nothing from which one might conclude that the caller is either honest or his information is reliable[]" and gave "no indication of the basis for the caller's prediction regarding . . . criminal activities[,]" the Court ultimately found the tip sufficiently reliable for purposes of establishing reasonable suspicion because "the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity[.]" *Id.* at 329, 331 (citation omitted) (cleaned up). According to the Court, police were able to verify the suspect's sex, the vehicle described in the tip, the time of the suspect's departure from the building, and her apparent destination. *Id.* at 331. The Court found the tipster's ability to predict "future behavior" of particular import, observing that "[b]ecause only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." *Id.* at 332.

In *Florida v. J.L.*, by contrast, the Supreme Court determined that no reasonable suspicion arose from an anonymous call to a police department that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. 529 U.S. at 268. At some point, two officers arrived at the scene, observed three black males "just

hanging out[,]" one of whom, J.L., was wearing a plaid shirt. *Id.* One of the officers approached J.L., frisked him, and recovered a gun from his pocket. *Id.* The question presented to the Court was whether "an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person." *Id.* The Supreme Court held that the search was invalid under the Fourth Amendment. *Id.*

The Supreme Court began its discussion by observing that the police officers' suspicion that J.L. was carrying a gun arose "solely from a call made from an unknown location by an unknown caller[]" and not from any observations of their own. *Id.* at 270. Citing *Alabama v. White* as an example, the *J.L.* Court acknowledged that there are situations "in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Id.* (quoting *White*, 496 U.S. at 327). The Court contrasted the facts in *White* from the facts before it, noting that the anonymous call concerning J.L. "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271. By failing to provide both predictive information or an explanation concerning "how [the tipster] knew about the gun[,]" there could be no "basis for believing [the tipster] had inside information about J.L." *Id.* And although the Court observed the tip accurately described the "subject's readily observable location and appearance" such details are only reliable in a "limited sense[]" because they do "not show that the tipster has knowledge of concealed criminal activity." *Id.* at 272. According to the Court, "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* (citation omitted).

13

In rendering its decision, the Supreme Court rejected a *per se* exception for anonymous tips regarding firearms, recognizing the danger that guns may pose, but concluding that such an exception would encompass too many situations, such as any allegation of drug dealing. *Id.* at 272–73. At the same time, the Court declined to shut the door altogether on whether there are "circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability." *Id.* at 273. By way of example, the Court noted "a report of a person carrying a bomb" may not need the same "indicia of reliability" demanded "for a report of a person carrying a firearm" before law enforcement can conduct a *Terry* stop and frisk. *Id.* at 273–74.

In *Navarette v. California*, the Supreme Court considered whether an officer had reasonable suspicion to make an investigatory stop in the context of an anonymous 911 call reporting a suspected drunk driver. 572 U.S. 393. Applying a "totality of the circumstances" approach, the Supreme Court held that the tip from the anonymous 911 caller was sufficiently reliable to support a *Terry* stop. *Id.* at 404. In that case, the police department received an anonymous 911 call claiming that a particular truck had run the caller off the road. *Id.* at 395. The caller provided the license plate number, make, and model of the truck, and identified the road and the direction the truck was traveling. *Id.* The officers responded and saw the alleged truck on the road and followed it for about five minutes without noticing any dangerous or erratic driving behavior. *Id.* Nonetheless, the officers stopped the truck. *Id.* During the stop, they smelled marijuana, so they conducted a search that resulted in the discovery of 30 pounds of marijuana. *Id.* The Supreme Court

14

found the stop to be supported by reasonable suspicion, even though the officers had not been able to corroborate any illegal activity (such as dangerous driving) during their five-minute observation of the truck. *Id.* at 404.

After discussing both the *White* and *J.L.* cases, the Supreme Court determined that, even assuming the 911 call was anonymous, "the call bore adequate indicia of reliability for the officer to credit the caller's account" and "[t]he officer was therefore justified in proceeding from the premise that the truck had, in fact, caused the caller's car to be dangerously diverted from the highway." *Id.* at 398–99. In concluding that the call was reliable, the Court focused on three factors. First, the Court commented on the fact that the caller had eyewitness knowledge of the alleged criminal behavior. *Id.* at 399. Specifically, the Court pointed out that the caller claimed to have been run off the road, "which necessarily implie[d] that the informant knows the other car was driven dangerously." *Id.* at 399. Second, the Court pointed out the contemporaneous nature of the call, observing that the "timeline of events suggests that the caller reported the incident soon after she was run off the road." *Id.* The Court stated that this "sort of contemporaneous report has long been treated as especially reliable." *Id.* The final factor weighing in favor of the tip's veracity was "the caller's use of the 911 emergency system." *Id.* at 400. The Court observed that the 911 emergency system not only relays a caller's cell phone number and approximate geographical location to 911 dispatchers, thereby providing "some safeguards against . . . false reports[,]" but may also record 911 calls, which provides victims of false reports "an opportunity to identify the false tipster's voice and subject him to prosecution" under applicable state laws. *Id.* at 400–01.

15

After determining that the anonymous tip was sufficiently reliable, the Supreme Court proceeded to the second part of the analysis under *Terry*—whether, at the time of the stop, the officer had a reasonable belief that the criminal activity was ongoing—explaining that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Id.* at 401 (quoting *Terry*, 392 U.S. at 30). The Court explained that it must "therefore determine whether the 911 caller's report of being run off the roadway created reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness." *Id.*

Focusing on the nature of the specific type of criminal activity, the Supreme Court concluded that the nature of the driver's conduct—running another car off the highway— bore "too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness." *Id.* at 403. The Court stated that "[w]e cannot say that the officer acted unreasonably under these circumstances in stopping a driver whose alleged conduct was a significant indicator of drunk driving." *Id.* The Court reasoned that because the specific allegation of dangerous driving created "reasonable suspicion of drunk driving[,]" law enforcement was not required to "personally observe suspicious driving[]" prior to executing a stop, as "[o]nce reasonable suspicion of drunk driving arises, 'the reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.'" *Id.* at 403–04 (citing *Sokolow*, 490 U.S. at 11) (cleaned up). The Court observed that this is particularly true in the context of drunk driving, where "allowing a drunk driver a second chance for dangerous conduct could have disastrous consequences." *Id.* at 404.

16

### B. Anonymous 911 Call and the Investigatory Stop of Mr. Trott

We must determine whether, under the totality of the circumstances, the stop here comported with the reasonable suspicion requirement of the Fourth Amendment. Our analysis requires that we consider whether the anonymous tip provided sufficient indicia of reliability, and whether the police officers had a particularized and objective basis for suspecting ongoing criminal activity at the time of the stop. Mr. Trott argues that the anonymous tip does not meet the reliability threshold described in *Navarette* because there is: (1) no basis for either imputing "eyewitness knowledge" to the tipster or concluding the anonymous tip was reported at the time the tipster witnessed unlawful activity; (2) no concrete allegation of criminal activity set forth in the tip; (3) no predictive information set forth in the tip; and (4) no evidence that the system through which the tip was reported decreased the likelihood of false tips. Even if this Court were to find the tip reliable, Mr. Trott argues there is no basis for finding reasonable suspicion, as the allegation of intoxicated driving was conclusory, and Corporal Cooper failed to observe anything indicative of criminal activity. According to Mr. Trott, his presence outside a liquor store at the time of the stop "does not add in any way to the totality of circumstances[.]"

Unsurprisingly, the State contends Corporal Cooper had the reasonable suspicion necessary to effect a stop of Mr. Trott. According to the State, a tip reporting drunk driving is different than tips reporting other crimes because drunk driving presents an "imminent threat to public safety." The State asserts that, while anonymous tipsters may generally need to provide more particularized descriptions of unlawful activity, a specific allegation of drunk driving without a detailed description of the reason an anonymous tipster believes

17

the driver is intoxicated should be sufficient to justify a seizure given the "exigent circumstances" presented by drunk driving. In light of the foregoing, the State contends Corporal Cooper had reasonable suspicion to stop Mr. Trott outside the liquor store because the tipster provided a specific allegation of intoxicated driving that was sufficiently descriptive to ensure police would only stop the subject of the tip, and Corporal Cooper was able to timely identify the reported vehicle outside a liquor store. The lawfulness of the seizure, the State asserts, finds further support in precedent establishing the diminished expectation of privacy that a motorist enjoys in his or her vehicle, as well as the minimal intrusion associated with stopping an already parked vehicle.[7]

We conclude that the anonymous tip in this case provided sufficient indicia of reliability and that, under the totality of the circumstances, the police officers had a particularized and objective basis for suspecting ongoing criminal activity.

We start our Fourth Amendment analysis with an examination of whether the 911 call bore sufficient indicia of reliability to form the basis for the stop. To be sure, unlike the caller in *Navarette*, the caller here did not allege that he or she was run off the road. Admittedly, this is a close case and on its own, such a "bare bones," conclusory allegation would not suffice to support a stop. However, as noted above, our determination of whether an officer has the reasonable suspicion necessary to justify an investigatory stop is a highly

---

[7] The State has argued that, even if we were to find that Corporal Cooper's stop lacked reasonable suspicion, the stop was justified under the community caretaking exception. Given our holding that, under the totality of the circumstances presented in this case, the officers had reasonable suspicion to effectuate the stop under the Fourth Amendment, we shall not address the community caretaking exception.

18

fact-intensive inquiry, and we consider the totality of the circumstances known to the officer at the time of the stop. Our consideration of all of the factors described below lead us to conclude that the officer had reasonable suspicion.

First, we note that, although conclusory, an allegation that a person is intoxicated is "the kind of shorthand statement of fact that lay witnesses have always been permitted to testify to in court." *State v. Crawford*, 67 P.3d 115, 119 (Kan. 2003) (citation and internal quotations omitted); *see also State v. Amelio*, 962 A.2d 498, 502 (N.J. 2008) (explaining that "the signs of drunkenness are matters of common knowledge and experience"). But the tip did not simply allege drunk driving. The tip was contemporaneous to the reported behavior and provided detailed and specific information. The 911 dispatcher provided the officer with the color of the vehicle, the Maryland license plate number and the registration number. There is no question that the dispatch described the motor vehicle with sufficient particularity such that Corporal Cooper could be certain that the vehicle he stopped was the same one identified by the caller. We note that other courts have found detailed descriptions of vehicles, including full license plate numbers and locations, to be helpful corroborating details. *See, e.g.*, *Commonwealth v. Depiero*, 25 N.E.3d 896, 900 (Mass. App. Ct. 2015). Additionally, Corporal Cooper arrived at the location provided by the dispatcher within two to eight minutes after receiving the call. The fact that the car was located exactly where it was reported to be within minutes of the call lends credence to the notion that the caller reported an ongoing crime as it happened. This "sort of contemporaneous report has long been treated as especially reliable" as "'substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious

19

misrepresentation.'" *Navarette*, 572 U.S. at 399–400 (quoting Fed. R. Evid. 803(1) advisory committee notes); *see also* Md. Rule 5-803(b)(1) (providing that "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter[]" is "not excluded by the hearsay rule[]"); *Booth v. State*, 306 Md. 313, 324 (1986) (observing that "the 'present sense impression' exception to the hearsay rule rests upon a firm foundation of trustworthiness[]").

The caller's use of the 911 emergency system to report intoxicated driving also bears favorably on the tip's veracity. As the Supreme Court observed in *Navarette*, "911 calls can be recorded" and the Federal Communications Commission ("FCC") not only requires cellular carriers to relay caller phone numbers to 911 dispatchers but also requires carriers "to identify [a] caller's geographic location with increasing specificity." *Id.* at 400–01 (citations omitted). These features that are designed to better identify 911 callers, coupled with the State criminalizing knowingly false reports of criminal activity, *see* Maryland Code, Criminal Law § 9-503,[8] would make "a reasonable officer . . . conclude that a false tipster would think twice before using" 911 to report a phony tip. *Id.* at 401.

---

[8] Maryland Code, Criminal Law § 9-503 provides:

> (a) A person may not make, or cause to be made, a statement or report that the person knows to be false as a whole or in material part to an official or unit of the State or of a county, municipal corporation, or other political subdivision of the State that a crime has been committed or that a condition imminently dangerous to public safety or health exists, with the intent that the official or unit investigate, consider, or take action in connection with that statement or report.

Having determined that the anonymous call was reliable, we also conclude that "the observed conduct, when viewed in the context of all the other circumstances known to the officer, was indicative of criminal activity." *Sizer*, 456 Md. at 365 (citations omitted). Within minutes of receiving the dispatcher's call relaying an anonymous tip alleging that an intoxicated driver was operating a particular vehicle at a specific location, law enforcement located the exact vehicle at the precise location identified in the tip. When law enforcement made contact with the vehicle, it was nearly 11:30 p.m., the vehicle was parked outside a liquor store, the keys were in the ignition, and the car was running. The 911 call, taken with the officer's observation of the running vehicle parked at a liquor store at 11:30 at night, creates a reasonably objective belief that the driver of the vehicle may be consuming alcohol. In other words, the nature of the business and the lateness of the hour were certainly among the totality of the circumstances available to Corporal Cooper when he undertook his investigation. While it is true that these details, when viewed in isolation, may suggest innocent activity, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Here, the anonymous tip, coupled with the circumstances surrounding the stop, was sufficient to "warrant further investigation[.]" *Cartnail*, 359 Md. at 290 (citation omitted). Considering the totality of all of the circumstances available to Corporal Cooper, his act of approaching the stopped and idling vehicle and knocking on the window to investigate, was reasonable.

In reaching our conclusion that the investigatory stop in this case was reasonable, other factors inform our decision. Specifically, in determining the validity of the stop, it is not unreasonable to consider both the level of the intrusiveness occasioned by the stop, as

21

well as the risk of harm resulting from a failure to detain the driver.[9]  In considering the level of intrusiveness, the nature of the seizure involved a stopped vehicle and a minimal intrusion.  The automobile was parked and running, and the encounter was brief—it only lasted long enough for Corporal Cooper to knock on the window and ask Mr. Trott a few questions.  As the Supreme Court has recognized, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion."  *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (citation omitted).  If Corporal Cooper had not

[9] Prior to the Supreme Court's decision in *Navarette*, Chief Justice Roberts noted in his dissent to the denial of *certiorari* in *Virginia v. Harris*, 558 U.S. 978 (2009), that the "majority of courts examining the question [had] upheld investigative stops of allegedly drunk or erratic drivers, even when the police did not personally witness any traffic violations before conducting the stops." *See Harris*, 558 U.S. 978, n.2 (citing *United States v. Wheat*, 278 F.3d 722 (8th Cir. 2001); *People v. Wells*, 136 P.3d 810 (Cal. 2006); *State v. Prendergast*, 83 P.3d 714 (Haw. 2004); *State v. Walshire*, 634 N.W.2d 625 (Iowa 2001); *State v. Crawford*, 67 P.3d 115 (Kan. 2003); *Bloomingdale v. State*, 842 A.2d 1212 (Del. 2004); *State v. Golotta*, 837 A.2d 359 (N.J. 2003); *State v. Scholl*, 684 N.W.2d 85 (S.D. 2004); *State v. Boyea*, 765 A.2d 862 (Vt. 2000); *State v. Rutzinksi*, 623 N.W.2d 516 (Wis. 2001)).  This view was not shared by all jurisdictions.  *See Wheat*, 278 F.3d at 729–30 (reviewing cases upholding stops, then noting that some courts "have reached a different conclusion[]").  When considering an anonymous tip alleging drunk driving, as part of its reasonable suspicion analysis, other jurisdictions that upheld the stops considered not just the reliability of the call, but also the potential risk to public safety and the minimal intrusion necessitated by the investigatory stop.  *See, e.g.*, *Boyea*, 765 A.2d at 868 (explaining that "[i]n determining the validity of a stop, it is not unreasonable to consider both the risk of harm resulting from a failure to detain the driver, and the level of intrusiveness occasioned by a detention[]"); *Golotta*, 837 A.2d at 368 (observing that from a constitutional standpoint, the lesser privacy interest in an automobile and the nature of the intrusion are relevant in assessing the reasonableness of the police conduct).  Although these cases were decided prior to *Navarette*, we do not read *Navarette* as eliminating a court's ability to consider the nature of the crime (and attendant imminent danger to the public), as well as the level of intrusion (such as knocking on the window of a stopped but running vehicle parked in a liquor store parking lot), when undertaking a reasonable suspicion analysis.

smelled alcohol on Mr. Trott, the stop would have ended, and Mr. Trott would have been free to go on his way. Not only was the stop brief, it was minimally intrusive. In contrast to the search and seizure of one's person in *J.L.*, the intrusion in this case involved an officer approaching a stopped motor vehicle and knocking on a window. The Supreme Court has long recognized that people have a diminished expectation of privacy in their vehicles. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976) (noting that "one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence[]"). This is because a vehicle "has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *United States v. Knotts*, 460 U.S. 276, 281 (1983) (citations omitted); *see also People v. Wells*, 136 P.3d 810, 816 (Cal. 2006) (upholding the stop of an alleged drunk driver, in part, after concluding that "the level of intrusion of personal privacy and inconvenience involved in a brief vehicle stop is considerably less than the 'embarrassing police search' on a public street condemned by *J.L.*" and further observing that "in light of the pervasive regulation of vehicles capable of traveling on the public highways, individuals generally have a reduced expectation of privacy while driving a vehicle on public thoroughfares") (internal citations omitted); *State v. Crawford*, 275 Kan. 492, 497 (Kan. 2003) (upholding an investigatory stop based upon a reckless driving complaint, in part, on the observation that "brief investigatory stops of motor vehicles based upon reasonable suspicion are substantially less intrusive than other forms of seizures under the Fourth Amendment and are perceived as relatively minimal intrusions upon the Fourth Amendment freedoms[]").

23

Indeed, in *Lewis*, we recently distinguished between the "heightened expectation of privacy enjoyed in one's person[]" versus the "diminished expectation of privacy one enjoys in his or her vehicle." 470 Md. at 26.

Additionally, in determining that the investigatory stop was reasonable under the circumstances, we also consider the gravity of the risk of public harm. Unlike crimes involving possessory offenses, such as carrying an illegal gun or possessing drugs, the crime of drunk driving poses a significant and potentially imminent public danger. As Chief Justice Roberts observed, "[t]he imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases." *Virginia v. Harris*, 558 U.S. 978 (2009) (dissenting from denial of *certiorari*). While the police can observe the subject of other types of tips "and step in before actual harm occurs[,]" a "wait-and-see approach" with drunk driving "may prove fatal." *Id.* Indeed, unlike other criminal activity, drunk driving "is always dangerous, as it is occurring." *Id.* It is not passive activity—it is a dangerous criminal activity that, when undertaken, often has an immediate deadly impact on innocent citizens who unknowingly step into its path. Balancing the public's interest in safety against the minimal intrusion occasioned by the brief investigatory stop here, and considering the totality of the facts presented to Officer Cooper in this case, we conclude that the scales of justice tilt in favor of the stop.

## IV.

### Conclusion

We hold that the investigatory stop in this case satisfied the Fourth Amendment. Considering the totality of the circumstances, the officers had reasonable suspicion to

24

suspect that Mr. Trott was engaged in drunk driving. The anonymous 911 call had sufficient indicia of reliability—the tipster alleging the drunk driving provided the make, model, and license plate of the vehicle, as well as its location. The police arrived within minutes of receiving the call and observed the running vehicle parked at a liquor store around 11:30 p.m. on a Friday night. We determine that the stop was reasonable given the nature of the criminal activity—drunk driving, with its attendant imminent danger to the public—as well as the minimal and non-intrusive nature of the stop. Under the totality of the circumstances, the officer's stop was reasonable.

**CERTIFIED QUESTION ANSWERED. JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

25