Xavier S. Kopp v. State of Maryland, No. 34, September Term, 2025

**FOURTH AMENDMENT – STOP – REASONABLE SUSPICION – TIP –** Supreme Court of Maryland held that, under totality of circumstances, law enforcement officer lacked reasonable suspicion to stop defendant based on tip from caller, who was personal acquaintance of officer, by call directly to officer's cell phone, conveying that unfamiliar car with people in it had been parked in caller's neighborhood, and caller thought people were possibly engaged in illegal activity. Tip provided no indication of basis for caller's belief that occupants of car were possibly engaged in illegal activity other than that car with multiple people in it had been on street for extended period, was unfamiliar, and cell phones were in use in car. Although caller was known to officer and officer viewed caller as credible, tip, as corroborated by officer, lacked indicia of reliability necessary to establish reasonable suspicion. Supreme Court concluded that officer's corroboration of information provided by caller, testimony that location is high-crime area, and observation of car's brief movement did not afford reasonable suspicion for stop.

Supreme Court reiterated that, although reasonable suspicion need not be based on officer's personal observations and may be supplied by information from another person, under totality of the circumstances, tipster's veracity, reliability, and basis of knowledge are highly relevant factors in determining reasonable suspicion. Here, tip and corroboration by police officer did not provide reasonable suspicion for investigatory stop.

Supreme Court concluded that, in this case, information used in reasonable suspicion analysis concerning level of crime in area and whether location is high-crime area or area with significant level of crime did not meet criteria that it be information known to police officer at time of stop. In addition, officer testimony concerning "calls for service" alone is not sufficient to establish that location is high-crime area.

Supreme Court held that testimony that location is high-crime area was not sufficient to establish location to be high-crime area as factor in reasonable suspicion analysis. Supreme Court reaffirmed its holding in Washington v. State, 482 Md. 395, 443, 287 A.3d 301, 330 (2022), that,

> testimony concerning a location being a high-crime area must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop. Testimony must identify a location or geographic area, not an overly broad region, and particular criminal activity occurring in the not-too-distant past, to support the conclusion that the location is indeed a high-crime area. Additionally, the conduct giving rise to officers' suspicions must not be inconsistent with the nature of the crimes alleged to establish the high-crime area.

(Citation omitted).

Supreme Court concluded that, in this case, movement of car did not constitute flight and was circumstance that added nothing to reasonable suspicion analysis.

Circuit Court for Montgomery County
Case No. C-15-CR-23-000164

Argued: January 6, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 34

September Term, 2025

_____

XAVIER S. KOPP

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Opinion by Watts, J.
Gould, J., concurs.

_____

Filed: May 26, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

It is well established that the reasonable suspicion standard permits an officer to temporarily detain a person if the totality of the circumstances known to the officer at the time indicate that criminal activity may be afoot. See Terry v. Ohio, 392 U.S. 1, 21-22 (1968). Reasonable suspicion need not be based on an officer's personal observations; it may be supplied by information from another person. See Adams v. Williams, 407 U.S. 143, 146-47 (1972). Tips may vary greatly in reliability and value and no single rule encompasses the reasonable suspicion analysis for all tips. See id. at 147. Although there is no one-size-fits-all rule, under the totality of the circumstances approach, the tipster's veracity, reliability, and basis of knowledge are highly relevant factors in determining reasonable suspicion. See Alabama v. White, 496 U.S. 325, 328-29 (1990).

In this case, we must determine whether a tip to a police officer from a friend about a car parked in her neighborhood, along with the officer's observation of the car at the scene and testimony that the location is a high-crime area, provided reasonable suspicion for the officer to stop Petitioner Xavier S. Kopp's vehicle. The police officer received a call on his cell phone from a long-time acquaintance who said that there was a "suspicious black sedan" parked on a street in her townhome community. The caller was a resident of the townhome community whom the officer had known "personally" for years and whom the officer believed to be "credible." The call was not recorded and the caller did not want her name to be disclosed. The caller advised that the car at issue was "unfamiliar" and had been on her street for "an extended period of time" with cell phones "going on and off" in the car. According to the police officer, the caller told him that she "thought" the occupants of the car "were up to illegal activity, possibly breaking into vehicles."

The officer, traveling in a marked police vehicle, located the car on the street that the caller said it would be, facing forward at the end of the dead-end street. Two other marked police vehicles arrived and assumed staggered positions behind the first officer's vehicle, effectively blocking the car's ability to leave. The officer turned on his vehicle's overhead spotlight and began to approach the car. As the officer approached the car, it began to move forward slowly at approximately 5 to 10 miles per hour. The officer testified that he believed the driver was attempting to make a three-point turn; so, he returned to his police car and activated its red and blue emergency flashing lights. According to the officer, at this point, he believed he had reasonable suspicion to detain the driver of the car. When the officer approached the car, he smelled the odor of marijuana emanating from the vehicle, and another officer observed a large quantity of marijuana on the back seat. When Mr. Kopp, the driver of the car, got out of the vehicle, he told the officers that he had a firearm. Mr. Kopp was arrested and charged with marijuana and firearm offenses.

Mr. Kopp moved to suppress evidence recovered pursuant to the stop of his car. At the suppression hearing, the officer who received the call testified that the area in which Mr. Kopp's car was stopped is a high-crime area and that this, along with the tip and the movement of the car, caused him to believe there was reasonable suspicion. The circuit court denied the motion to suppress. After the denial of the motion, Mr. Kopp entered a conditional guilty plea to possession of a regulated firearm by a person under the age of 21 and was sentenced to a period of imprisonment.

Mr. Kopp noted a timely appeal. The Appellate Court of Maryland affirmed the judgment of the circuit court. See Kopp v. State, No. 1250, Sep. Term, 2023, 2025 WL

1648956, at *1, *13 (Md. App. Ct. June 11, 2025).

In this Court, Mr. Kopp contends that the circuit court erred in finding reasonable suspicion by crediting a lay person's report of innocent conduct as suspicious and misapplying this Court's holding in Washington v. State, 482 Md. 395, 287 A.3d 301 (2022), concerning the sufficiency of testimony necessary to establish that a location is a high-crime area.

The State responds that the officer had reasonable suspicion to detain Mr. Kopp because the tip was from a known source and therefore had greater indicia of reliability than that of an anonymous tip, the caller's reliability was corroborated by the officer's observations at the scene, and the police officer believed that Mr. Kopp was engaged in flight in a high-crime area.

For the reasons explained below, we hold that, under the totality of the circumstances presented in the case, the officer lacked reasonable suspicion to stop Mr. Kopp's car. We reverse the judgment of the Appellate Court.

## BACKGROUND

### The Call and the Stop

In the Circuit Court for Montgomery County, at the suppression hearing, Montgomery County Police Detective Sergeant Peter J. Muollo testified that on January 22, 2023, at approximately 9:30 p.m., he responded to a "call for service" at 13 Rosebay Court, which is located in a residential townhouse community in Germantown, Maryland. Sgt. Muollo testified that he "received information" from a caller whom he had known for the last 20 to 25 years and who lives in the community where the vehicle at issue was

- 3 -

located. When asked whether the call was a 911 call, Sgt. Muollo testified: "No, it was not[,]" but refrained from describing how he received the call, responding only that "[i]t was a phone call from a citizen in the community."[1] Sgt. Muollo testified that he did not take notes of what the caller told him during the call, that later another officer wrote the police report summarizing the call, and that quotes in the police report of statements said to have been made by the caller were not "verbatim."

Sgt. Muollo described the caller as a "credible individual" and testified that he was familiar with the community the caller lived in because he was "a supervisor" in the district.[2] Sgt. Muollo testified that the caller reported "a suspicious black sedan parked on [Rosebay Court], unfamiliar to the area," and that the vehicle "had been sitting there for an extended period of time with the lights out, [and] cell phones were going on and off in the vehicle[.]" Sgt. Muollo testified that the caller told him that she "thought" the occupants

---

[1]During the suppression hearing, when describing the nature of Sgt. Muollo's relationship with the caller, Mr. Kopp's counsel advised the circuit court that the "caller called [Sgt. Muollo's] cell phone[.]" The State did not dispute the representation. In his brief, in this Court, Mr. Kopp described the call as "a personal call[.]" In its brief, the State described the call by stating that Sgt. Muollo testified that the caller "called him directly to make a report."

[2]At the suppression hearing, the State advised that the caller wished to remain "anonymous" for fear of retribution. Mr. Kopp's counsel proffered that the defense team had spoken with someone who knew the caller and that the caller is "an intimate partner or a very, very close friend" of Sgt. Muollo. According to Mr. Kopp's counsel, Sgt. Muollo or a police car had been seen at the caller's location every other night for three years preceding Mr. Kopp's arrest. The transcript of the police department body worn camera footage admitted into evidence during the suppression hearing as State's Exhibit 5 shows that when Sgt. Muollo approached the car and began to question the occupants, the back seat passenger immediately stated: "You see -- you see my neighbor --" and "-- he comes to see my neighbor all the time." The State did not present the caller as a witness at the suppression hearing.

- 4 -

of the black sedan "were up to illegal activity, possibly breaking into vehicles." On cross-examination, Sgt. Muollo acknowledged that he did not remember the exact wording of the call, that he had no way to define what was meant by the phrase "extended period of time[,]" and that the caller may have said that the car had "been there for a long time or something along those lines."

Sgt. Muollo testified that when he received the call, he was at the Germantown Police Station, which was "pretty close" to Rosebay Court, so he arrived at Rosebay Court within ten minutes of the call. According to Sgt. Muollo, when he arrived, he "corroborated" the caller's information—that there was a black sedan parked on Rosebay Court. Sgt. Muollo described the black sedan as being on the right-hand side of Rosebay Court, at the end of the street facing its dead end. Sgt. Muollo testified that, when he first observed the black sedan, he could not see inside the vehicle. Sgt. Muollo testified that because he could not see who was in the vehicle, he turned on his vehicle's "overhead lights" but at that time did not turn on the vehicle's flashing blue and red emergency lights.

According to Sgt. Muollo, when he turned his vehicle's overhead lights on the black sedan, he was aware that there was "at least" one police car behind him.[3] Sgt. Muollo testified that he "started to exit" his police vehicle so that he could "approach the [black

---

[3]Police department body camera footage admitted into evidence during the suppression hearing as Defense Exhibit 5 shows that, including Sgt. Muollo's vehicle, there were three police cars at the scene in staggered positions behind Mr. Kopp's vehicle. In his brief, Mr. Kopp advises that the body camera footage shows the three police vehicles positioned at the scene at five seconds into the footage. The transcript of the body camera footage shows that Sgt. Muollo first exited his vehicle at 34 seconds into the footage. Sgt. Muollo provided no testimony about how the other two police vehicles came to be at the location.

sedan] to make contact with the occupants" but upon doing so, "the vehicle began to pull off." Sgt. Muollo testified that the vehicle began to "pull off towards the dead end" at no more than "5 or 10 miles per hour" and that it appeared to him that the vehicle was attempting to make "a three-point turn."

Sgt. Muollo testified that when he initially pulled up behind the black sedan, he intended to walk up and talk to the occupants. But, according to Sgt. Muollo, once the vehicle "start[ed] to pull away," he developed "reasonable, articulable suspicion that there was something going on there that was criminal in nature." Sgt. Muollo testified:

> I went over there just to check it out. As soon as I got there, I'm pulling onto a street, it's nighttime, it's dark. I see a vehicle that from a who I deemed a credible source said was unfamiliar to the area, it's parked on a dead end street. It's a high-crime area. It has out-of-state tags, so, right away, all these totality of circumstances, I'm thinking that maybe there is activity going on there. However, I'm still going to walk up and talk to the occupants of the vehicle. Maybe they have a legitimate reason for being there. But as soon as they see a marked car, an officer in uniform, and it starts to pull away from me, that immediately rose my level to that there was reasonable, articulable suspicion that there was something going on there that was criminal in nature.

(Paragraph breaks omitted).

Sgt. Muollo testified that after the black sedan attempted to "pull off[,]" he believed that he "had reason to detain the individual"; so, he returned to his police car and turned on its emergency lights. Sgt. Muollo explained that he approached the vehicle and made contact with the driver, Mr. Kopp, whom he described as "very cooperative." Sgt. Muollo testified that upon approaching the vehicle, he "immediately smelled the overwhelming odor of marijuana emanating from the vehicle" and a Sgt. Harrell, who was assisting with the stop, "observed a large amount of marijuana on the back seat" while talking to the

- 6 -

passenger in the rear of the vehicle. At that point, Mr. Kopp and the backseat passenger were placed under arrest. As Mr. Kopp got out of the car, he told the officers that he had a firearm, which was located in a satchel that he was wearing.[4]

**High-Crime Area**

During the suppression hearing, Sgt. Muollo testified that he had been a supervisor in the Fifth District, Germantown, for months and had "familiarized [himself] with the area and various calls for service." Sgt. Muollo testified that every district is broken down into smaller geographical locations that are called "beats." Sgt. Muollo identified by name various beats that fall under the umbrella of the Fifth District and testified that Rosebay Court is part of a geographical location in the Fifth District known as the "5-Nancy-1" beat or the "Nancy-1 beat[.]"[5] Sgt. Muollo testified that he did not know the exact mileage of the Nancy-1 beat but that there are multiple neighborhoods in each beat. When asked on direct examination what, if anything, he knew about crime in the Nancy-1 beat, Sgt. Muollo responded:

> So, rather than speculate, I reached out to our Fifth District crime analyst to get us information on that specific beat. It was known to me as a high-crime area with a lot of calls for service in the Nancy-1 beat. It's usually very busy in that beat. And again, I reached out to the crime analyst to provide us with specific stats on that to back that up.

The circuit court admitted into evidence as State's Exhibits 3 and 4 lists of calls for

---

[4]Mr. Kopp was charged by criminal indictment with possession of a firearm during a drug trafficking crime, possession of a regulated firearm by a person under the age of 21, possession of a loaded handgun, possession of a loaded handgun in a vehicle, and possession with intent to distribute marijuana, stemming from the stop of his vehicle.

[5]For consistency, unless there is a reason not to, we will refer to the geographic area as the "Nancy-1 beat."

service for the year 2022 and January 2023 that had been provided to Sgt. Muollo by a Fifth District crime analyst. Based on State's Exhibit 4, Sgt. Muollo testified that, in 2022, there were 400 calls for service in the Nancy-1 beat. According to Sgt. Muollo, the 400 calls were for "more serious" crimes and did not include calls for "all the numerous small crimes[.]"

On cross-examination, based on a scale at the bottom of Defense Exhibit 3, which contained a map of the beats in Montgomery County, Sgt. Muollo testified that the "5-N-1" beat was approximately three to four miles long and at least a "half a mile to one mile to up to maybe two miles" wide. When asked whether he had examined the calls for service for 2022 and January 2023 to determine the nature of the call closest to the location of the stop of Mr. Kopp's vehicle, Sgt. Muollo responded that he had not.

Mr. Kopp called as a witness Jeffrey Zahler, one of the attorneys who had been representing him in the case. Mr. Zahler testified that he had reviewed the information from the crime analyst and, using Google Maps, for each call for service in January 2023, determined how far away from 13 Rosebay Court the call for service was. Mr. Zahler testified that there were 28 calls for service listed for January 2023, and that the closest call for service to 13 Rosebay Court that month was .6 miles away from the location. According to Mr. Zahler, this was an "anomaly," as all of the 27 other calls were at least 1.3 miles away from the Rosebay Court location. Mr. Zahler testified that one of the calls was at least 3.7 miles away. In addition, Mr. Zahler testified that he reviewed the data for 2022, as well as for January 2023, *i.e.*, for a 13-month period, to determine how many calls for service there were for the twelve streets closest to 13 Rosebay Court. According to Mr.

Zahler, for the thirteen months, there was one call for service on the twelve streets closest to 13 Rosebay Court and that call had been in July 2022 for a larceny of less than $50.

**The Circuit Court's Ruling and the Conditional Guilty Plea**

Ruling orally, the circuit court denied the motion to suppress. The circuit court stated:

> [T]he question is whether or not the officers had reasonable, articulate suspicion when they turned on their emergency lights and stopped the vehicle. It's at that point in time any reasonable person would be clear that they are subject to a detention by the police, when the police turn their lights on, they were not supposed to leave, you're supposed to pull over, or you are committing another crime. So, that, to me, is the pivoting timeframe. Putting a spotlight on a vehicle does not indicate any seizure that I am aware of, and I don't know of any case law that would suggest otherwise.

The circuit court ruled that whether the area is a high-crime area was not material, as "[t]here certainly is a significant level of crime in the area." The court found that, under the totality of circumstances, reasonable suspicion existed "based on the informant's call, based upon the level of crime generally in the area and based upon the vehicle, upon being approached by the police, then driving away[.]"

After the motion was denied, Mr. Kopp entered into a conditional guilty plea to possession of a regulated firearm by a person under the age of 21 and was sentenced to five years of imprisonment, with all but six months suspended and credit for time served, followed by three years of supervised probation.

**Opinion of the Appellate Court of Maryland**

On June 11, 2025, in an unreported opinion, the Appellate Court of Maryland affirmed the circuit court's denial of Mr. Kopp's suppression motion. See Kopp, 2025 WL

- 9 -

1648956, at *1, *13. Adopting Mr. Kopp's argument that "the stop began when the police blocked in the dead-end street with three police cruisers and shone a spotlight on his vehicle[,]" the Appellate Court concluded that Mr. Kopp was first seized "at the moment his vehicle was blocked in with no exit available." Id. at *8-9.

Having determined the point at which Mr. Kopp was seized, the Appellate Court turned its inquiry to whether the officers had reasonable suspicion at the time of the seizure. See id. at *9. The Appellate Court stated that an informant's tip may contribute to an officer's reasonable suspicion, so long as the information from the informant's tip is "sufficiently reliable" and that factors to consider in determining the reliability of an informant's tip are the informant's "'veracity, reliability,' and his or her 'basis of knowledge.'" Id. (citing State v. Rucker, 374 Md. 199, 213, 821 A.2d 439, 447 (2003)). The Appellate Court posited that the totality of the circumstances "weighed in favor of upholding a brief, investigatory stop[,]" stating that Sgt. Muollo received a tip

> from a credible individual who lived in the community and that [Sgt. Muollo] knew personally for the last 20 to 25 years, reporting that there was a "suspicious black sedan parked on that street," that was "unfamiliar" and parked for "an extended period of time with the lights out," that multiple individuals occupied it, and that the caller believed "they were up to illegal activity, possibly breaking into vehicles." When Det. Sgt. Muollo arrived on the scene, notably ten minutes later, he observed a vehicle matching the caller's description.

Id. at *11.

The Appellate Court outlined the factors this Court set forth in Washington, 482 Md. at 443, 287 A.3d at 330, for determining whether a location is in a high-crime area, and described Sgt. Muollo's testimony during the suppression hearing as being that he

- 10 -

knew that Rosebay Court was "a very busy area, [with] a lot of calls for service, and what [he] would describe as a high crime area[.]" Kopp, 2025 WL 1648956, at *11-12. The Appellate Court described the circuit court's finding as being that Rosebay Court has "a significant level of crime in that area," and, without applying the factors set forth in Washington, concluded that the finding "was not clearly erroneous" and "was supported by competent evidence[.]" Id. at *12. The Appellate Court concluded that "there was reasonable, articulable suspicion to justify a brief investigation" at the time that Mr. Kopp "was stopped when the police arrived at Rosebay Court and blocked in his vehicle[,]" and that the circuit court properly denied the motion to suppress. Id. at *13.

**Petition for a Writ of *Certiorari***

On July 25, 2025, Mr. Kopp petitioned for a writ of *certiorari*, raising the following three questions:

1. May reasonable suspicion for a *Terry* stop be predicated upon a citizen caller's personal report to a police officer, in which the citizen/caller claims suspicion of "illegal activity" based upon wholly innocent conduct, without some articulation by the police officer of how that conduct is indicative of criminality?

2. Did the lower courts misapply *Washington v. State*, 482 Md. 395 (2022), in determining whether the residential townhome neighborhood in this case was a "high crime area[]"[?]

3. Did the lower courts err in determining there was reasonable suspicion under the totality of circumstances in this case; and, therefore, did the motions court err in denying Mr. Kopp's motion to suppress evidence?

On September 19, 2025, we granted the petition. See Kopp v. State, 492 Md. 411, 344 A.3d 676 (2025).

## Standard of Review

"Our review of a circuit court's denial of a motion to suppress evidence under the Fourth Amendment, ordinarily, is limited to the information contained in the record of the suppression hearing and not the record of the trial." State v. Wallace, 372 Md. 137, 144, 812 A.2d 291, 295 (2002) (citations omitted). We view "the trial court's findings of fact, the evidence, and the inferences that may be drawn therefrom in the light most favorable to the party who prevails" on the motion, in this case, the State. Norman v. State, 452 Md. 373, 386, 156 A.3d 940, 948 (2017) (quoting Varriale v. State, 444 Md. 400, 410, 119 A.3d 824, 830 (2015)). When we review a trial court's ruling on a motion to suppress, we "review[] for clear error the trial court's findings of fact, and review[] without deference the trial court's application of the law to its findings of fact." Id. at 386, 156 A.3d at 947-48 (quoting Varriale, 444 Md. at 410, 119 A.3d at 830).

## Reasonable Suspicion: Case Law

The Fourth Amendment to the United States Constitution prohibits the government from subjecting people to "unreasonable searches and seizures[.]" U.S. Const. amend. IV. "For the Fourth Amendment's purposes, a 'seizure' of a person is any nonconsensual detention." Washington, 482 Md. at 420, 287 A.3d at 316 (quoting Norman, 452 Md. at 386-87, 156 A.3d at 948). Generally, there are two types of seizures of a person: an arrest,

---

[6]Because the three questions presented in the petition for a writ of *certiorari* raise essentially the same issue—whether police officers had reasonable suspicion to justify stopping Mr. Kopp's vehicle—we will address the questions together.

which requires probable cause, and an investigatory stop or detention, also known as a Terry stop, which requires reasonable suspicion. See Norman, 452 Md. at 387, 156 A.3d at 948. A Terry stop is "less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual." Swift v. State, 393 Md. 139, 150, 899 A.2d 867, 873 (2006) (citations omitted). The officer must have "a reasonable, articulable suspicion of criminal activity" and the investigatory detention/stop must be "limited in duration and purpose[.]" Id. at 150, 899 A.2d at 873.

In Illinois v. Gates, 462 U.S. 213, 238 (1983), the Supreme Court of the United States held that the totality of the circumstances test applies for determining probable cause for issuance of a search warrant. Since Gates, "the Supreme Court has consistently held that the totality of the circumstances standard applies when a court assesses both probable cause and reasonable suspicion." State v. Stone, 493 Md. 78, 100, 350 A.3d 786, 799 (2026) (citation omitted). The Supreme Court of the United States has repeatedly held that reasonable suspicion cannot be confined to a single set of conditions or a narrow legal rule. See, e.g., Ornelas v. United States, 517 U.S. 690, 695-96 (1996). The Supreme Court has explained that courts making "reasonable-suspicion determinations" "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (citation modified).

Like the Supreme Court of the United States, this Court has explained that the reasonable suspicion standard is "obviously less demanding than that for probable cause[,]"

and that reasonable suspicion is determined under the totality of the circumstances standard. Ferris v. State, 355 Md. 356, 375-76, 385, 735 A.2d 491, 501, 506 (1999) (citation modified). Reasonable suspicion has been described as a commonsense, nontechnical concept that "depends on the factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act[.]" Stone, 493 Md. at 100, 350 A.3d at 799 (citation modified). In determining reasonable suspicion, "due weight must be given, not to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27 (citation omitted). This Court has held the same: "A hunch or general suspicion is not enough[.]" Washington, 482 Md. at 422, 287 A.3d at 317.

Both this Court and the Supreme Court of the United States have held that reasonable suspicion may arise from information provided by an informant. See Rucker, 374 Md. at 213, 821 A.2d at 447 (collecting cases). However, "[i]nformation furnished by an informant must be sufficiently reliable in order to provide reasonable suspicion justifying an investigatory stop." Id. at 213, 821 A.2d at 447 (citation omitted). In Gates, 462 U.S. at 230, the Supreme Court held that an informant's "'veracity,' 'reliability[,]' and 'basis of knowledge' are all highly relevant in determining the value of" a tip. The Supreme Court explained that these elements should not be understood "as entirely separate and independent requirements to be rigidly exacted in every case[.]" Id. (footnote omitted). Rather, "[t]hey should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question of whether there is 'probable

cause' to believe that contraband or evidence is located in a particular place." Id. Considering an informant's "basis of knowledge" means that the information provided must show some of the underlying circumstances on which the informant's conclusions were based. See id. at 228-30.

In White, 496 U.S. at 328-29, the Supreme Court held that an informant's tip must exhibit sufficient "indicia of reliability" in order for the tip to justify an investigative stop. The Supreme Court explained that where a court is analyzing a tip under the reasonable suspicion standard, a tipster's veracity, reliability, and basis of knowledge are highly relevant factors to be considered. See id. In White, id. at 327, officers received an anonymous tip that a woman would be leaving an address at a particular time, in a brown Plymouth station wagon with a broken taillight, going to a particular motel, and that she would be in possession of cocaine. The officers responded to the address and observed a woman get into a brown Plymouth station wagon with a broken taillight and leave the address. See id. Officers followed the woman as she drove toward the motel, stopped the woman in her vehicle, informed her that she was suspected of transporting cocaine in the vehicle, and requested to search the vehicle. See id.

The Supreme Court concluded that, under the totality of the circumstances, "the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that [the woman] was engaged in criminal activity[.]" Id. at 331. The woman's departure from the building was corroborated as being within the timeframe predicted by the caller, and even though the officers stopped the car before it reached the motel, the route driven by the woman was the most direct possible route to the predicted destination. See id. at 331-32.

The Supreme Court explained that "[w]hat was important was the caller's ability to predict [the woman's] future behavior, because it demonstrated inside information—a special familiarity with [the woman's] affairs." Id. at 332 (emphasis omitted). The Supreme Court concluded that the tip, "as corroborated, exhibited sufficient indicia of reliability" to provide reasonable suspicion for the stop of the car. Id.

In contrast, in Florida. v. J.L., 529 U.S. 266, 268, 271 (2000), the Supreme Court concluded that an anonymous tip alleging that a man who was wearing a plaid shirt and standing at a particular bus stop was carrying a gun lacked the "indicia of reliability present in *White*[.]" The Court explained that the tip lacked any predictive information that would have allowed the police to "test the informant's knowledge or credibility." Id. at 271. The anonymous tipster did not provide any information concerning how the caller knew the man had a gun and did not offer "any basis for believing he had inside information" about the man. Id. The Supreme Court reiterated "that an anonymous tip [must] bear standard indicia of reliability in order to justify a stop[,]" and concluded the officers did not have a reasonable basis for stopping the man. Id. at 274.

This Court addressed issues concerning the reliability of an informant's tip in Rucker, 374 Md. at 203, 821 A.2d at 441-42, a case in which detectives stopped and questioned a man based on a tip from a confidential source that the man was in possession of and distributing crack cocaine. The source gave a detective "very detailed information" about the man, including a physical description; a "partial tag" of the man's car; and "predictive" information about when and where the man would be "on a particular day and at a particular time in the future[.]" Id. at 215, 821 A.2d at 448-49. The source

accompanied detectives to the location, where he had predicted the man would be, and identified the individual as the person he had described before the stop occurred. See id. at 204, 821 A.2d at 442. We concluded that, "in light of the totality of the circumstances, . . . the information provided by the confidential source was sufficiently reliable so as to provide the police with reasonable suspicion to stop [the person]." Id. at 215, 821 A.2d at 449. We stated:

> Information furnished by an informant must be sufficiently reliable in order to provide reasonable suspicion justifying an investigatory stop. In determining reliability, we look at the totality of the circumstances. In looking at the totality of the circumstances, we consider an informant's veracity, reliability, and his or her basis of knowledge. Rather than being treated independently, these factors must be viewed as interacting components in the totality of the circumstances analysis: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

Id. at 213-14, 821 A.2d at 447-48 (citation modified). We noted that in White and Gates, the Supreme Court of the United States explained that the level of detail contained in a tip, as verified by police officers, and "the predictive nature of [the] details" or "that the details pertained to future actions not easily predicted" provided reasonable suspicion or probable cause. Rucker, 374 Md. at 214-15, 821 A.2d at 448. We determined that the detail provided by the confidential source was compelling because it was predictive—that the individual in question "would be at a specific shopping center parking lot on a particular day and at a particular time in the future, is not information that would be commonly known[.]" Id. at 215, 821 A.2d at 449.

More recently, in Trott v. State, 473 Md. 245, 250, 271, 249 A.3d 833, 836, 848 (2021), we considered whether a tip made via an anonymous 911 call to a police department

reporting a drunk driver, which included the specific location and license plate number of the vehicle driven by the driver, "had sufficient indicia of reliability" to provide reasonable suspicion to justify an investigatory stop. We concluded that, under the totality of the circumstances, the tip "provided sufficient indicia of reliability" to warrant the stop of the vehicle. Id. at 265, 249 A.3d at 845. We explained that "the tipster alleging the drunk driving provided the make, model, and license plate of the vehicle, as well as its location[,]" and within minutes of receiving the call, a police officer arrived at the reported location and observed "the running vehicle parked at a liquor store around 11:30 p.m. on a Friday night." Id. at 271, 249 A.3d at 848. In concluding that the tip, as corroborated, had sufficient indicia of reliability to justify the stop, we explained that an anonymous tipster's use of a 911 emergency call system "bears favorably on the tip's veracity" because 911 calls can be recorded and show the caller's geographic location, which helps better identify 911 callers and deter "false tipster[s]." Id. at 267, 249 A.3d at 846.

### This Case

#### *A. When the Stop Occurred*

Before turning to an analysis of the tip, we will briefly address the discrepancy between the circuit court's finding as to when the stop occurred and the Appellate Court's conclusion. The circuit court found that the stop occurred after Mr. Kopp's vehicle moved forward, and Sgt. Muollo, believing that there was reasonable suspicion to justify a stop, activated his cruiser's blue and red emergency lights. According to the circuit court, at that time "any reasonable person would be clear that they [we]re subject to a detention by the police[.]" The Appellate Court concluded that the stop occurred earlier, at the point at

which Mr. Kopp's vehicle was blocked in by police cars and physically unable to leave the street. See Kopp, 2025 WL 1648956, at *8-9. Because of the Fourth Amendment implications, the question of when a stop occurs is a mixed question of fact and law, see Cartnail v. State, 359 Md. 272, 282-83, 753 A.2d 519, 525 (2000); Wallace v. State, 373 Md. 69, 78, 816 A.2d 883, 889 (2003), meaning we review the trial court's factual determinations for clear error and its application of the law without deference.

In this case, however, the finding as to when the stop occurred is an issue that we do not need to review. We will proceed on the premise that the stop occurred at the point determined by the circuit court—after Sgt. Muollo observed the vehicle move forward and turned on his vehicle's emergency lights, believing that he had reasonable suspicion for the stop. By doing so, we take into account all of the information corroborated by Sgt. Muollo and the events that he observed before making contact with Mr. Kopp. Because we conclude that the tip, as corroborated by Sgt. Muollo at the point at which he activated his cruiser's emergency lights, did not exhibit sufficient indicia of reliability to establish reasonable suspicion, the outcome would be the same even if we were to conclude that the stop occurred at an earlier point when Sgt. Muollo had less corroborative information.

### B. The Call/Tip

We must determine whether, under the totality of the circumstances, the tip from Sgt. Muollo's personal acquaintance, as corroborated by information that the Sergeant observed before stopping Mr. Kopp's vehicle, in combination with other factors, had sufficient indicia of reliability to provide reasonable suspicion. We begin with an analysis of the tip itself. This involves an assessment of the amount and type of details provided in

- 19 -

the tip, and the caller's veracity, reliability, and basis of knowledge, which are highly relevant factors.  See White, 496 U.S. at 328-29.  In this case, based on the content of the tip, the primary issues of concern are whether the caller provided the type of information that, if corroborated, would provide reasonable suspicion for an investigatory stop and whether the caller had an adequate basis of knowledge for the belief that the occupants of the car might be engaged in illegal activity—potentially breaking into cars.

We conclude that, standing alone, the tip is devoid of the indicia of reliability necessary to establish reasonable suspicion, as it provided no indication of the caller's basis of knowledge for the prediction that the occupants of the car may have been breaking into cars or were up to illegal activity and contained no information from which it could be concluded that the prediction was a reliable one.  The information that the caller provided lacked any support for the forecast that the occupants of the car may have been engaged in illegal activity or were possibly breaking into cars.  And, based on the content of the tip, there was no reason to conclude that the caller was a person who had any knowledge about the occupants of the car, other than her contemporaneous observations of the car.

Viewing the evidence in the light most favorable to the State, as we must, the caller advised that she observed: (1) an unfamiliar car, *i.e*., a black sedan; (2) stopped or parked for an extended period of time on a street in her townhome community; (3) with multiple occupants (according to Sgt. Muollo, the car was "occupied multiple times"); and (4) cell phones were going off in the car.  Based on this, the caller advised that she thought the occupants of the car might be "up to illegal activity, possibly breaking into vehicles." Unlike in Gates, the tip contained information about facts existing at the time of the tip,

- 20 -

but no information about anticipated or future actions of the occupants of the car that would indicate that the caller had a basis for the prediction that the occupants might be engaged in illegal activity. See Gates, 462 U.S. at 245 ("The anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.").

The tip itself contained no information about the caller's basis of knowledge—*i.e.*, why the caller thought the occupants of the car may have been engaged in illegal activity or breaking into cars—other than the location of the car, that it was "unfamiliar to the area," that it had been there for an extended period of time, and that there were people in it using cell phones. Based on Sgt. Muollo's testimony at the suppression hearing, the tip amounted to no more than the caller's hunch or guess that criminal activity may have been afoot. See, e.g., Washington, 482 Md. at 422, 287 A.3d at 317 (We explained that for a Terry stop, which requires reasonable suspicion, "[a] hunch or general suspicion is not enough[.]"). Just as reasonable suspicion for an investigatory stop cannot be premised on the hunch of an officer, see Ransome v. State, 373 Md. 99, 110-11, 816 A.2d 901, 908 (2003), it cannot be based on the hunch of an informant.

In addition, although Sgt. Muollo testified that he responded to a "call for service[,]" this was not a typical call for service to which some basic indicia of reliability might attach. A "call for service" is made when a member of the public calls a police department emergency 911 line or a non-emergency police line. See, e.g., *Make The Right Call*, MONTGOMERY COUNTY GOVERNMENT (2026), https://www.montgomerycountymd.gov/ OPI/make_right_call.html [https://perma.cc/S2AS-GBD4]. Calls for service data reflect

incidents captured in an agency's Computer-Aided Dispatch (CAD) system.[7]  See *Using*

*Calls For Service Data To Reduce False Burglar Alarms (And More)*, POLICE DATA

INITIATIVE (2017-2022 National Policing Institute), https://www.policedatainitiative.org/

calls-for-service/  [https://perma.cc/WV2D-GTKJ].[8]    Calls for service to police

departments are recorded to ensure accuracy and accountability and the recordings may be

used as evidence in court.  See Trott, 473 Md. at 267, 249 A.3d at 846 (We explained that

an anonymous tip made to a 911 emergency call system "bears favorably on the tip's

veracity" because 911 calls can be recorded and show the caller's geographic location,

which helps better identify 911 callers and deter "false tipster[s]."  (Citation modified)).

In this case, there is no recording or transcript of the call or even any

---

[7]CAD systems are used by dispatchers, emergency responders, 911 operators, and other local, state, and federal call-takers "to prioritize and record incident calls, identify the status and location of responders in the field, and effectively dispatch responder personnel."  Tech Note, *Computer Aided Dispatch Systems*, U.S. DEP'T OF HOMELAND SEC., (Sep. 2011) [https://perma.cc/5SHN-VYAD].  A caller is questioned by a dispatcher, who answers the call, about information relevant to the matter being reported and the call is recorded.  See id.  In most instances, caller identification technology is capable of identifying the telephone number from which the call originated and the geographic location of the incoming call.  See id.  After receiving a call from a member of the public, the dispatcher can log information relevant to the call and may relay pertinent information to a police officer or other available personnel to respond or be dispatched to a particular location.  See id.  The response status to the call is logged by the dispatcher and includes log on and off times of emergency personnel, assignments of emergency personnel, and incident reports.  See id.

[8]The Police Data Initiative is a collective of law enforcement agencies and researchers focused on collecting the data of law enforcement agencies to increase transparency and improve related technology.  See *About*, POLICE DATA INITIATIVE (2017-2022 National Policing Institute), https://www.policedatainitiative.org/about/ [https://perma.cc/YC46-QS2F].  There are more than 120 participating law enforcement agencies; Montgomery County Police Department is a participating agency. *Participating Agencies*, POLICE DATA INITIATIVE (2017-2022 National Policing Institute), https://www. policedatainitiative.org/participating-agencies/ [https://perma.cc/N7C9-VY5G].

contemporaneously made notes concerning the call. Under these circumstances, it cannot be said that the call had the indicia of reliability that might generally be accorded to a call for service that is made to a police department on a recorded line and for which a caller could be liable for having made a false report. Although it is not required that every tip to a police officer be recorded to establish reasonable suspicion, because Sgt. Muollo repeatedly referred to the call in this case as a "call for service," it is necessary to point out that this was not a typical call for service to which some general indicia of reliability might attach. See Trott, 473 Md. at 267, 249 A.3d at 846.

Also, although this was not an anonymous tip in the traditional sense of it being a tip from an unidentified caller in that the person who made the call to Sgt. Muollo was plainly an acquaintance of his, there was no information provided at the suppression hearing about the caller's reliability. Sgt. Muollo testified that he considered the caller to be credible; however, credibility and reliability are different concepts. When a police officer has worked with a person, such as an informant, who has provided a tip before and that person has a history of providing accurate information about criminal activity, this increases the indicia of reliability to be accorded to a tip from the person, and the informant is viewed as reliable. See Rucker, 374 Md. at 214, 821 A.2d at 448 (citing J.L., 529 U.S. at 270); Elliott v. State, 417 Md. 413, 431, 10 A.3d 761, 771 (2010). The most credible of people may convey information that cannot be relied upon to provide reasonable suspicion that criminal activity may be occurring. Although not required to establish reasonable suspicion, in this case, there is no information that the caller had ever provided reliable information concerning criminal activity to Sgt. Muollo or any other police officer. A court

considers not only the credibility of the tipster, but also the reliability of the information and its source, in determining whether a tip furnishes reasonable suspicion. See United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004).

In evaluating the indicia of reliability to be accorded to the tip, although the reasonable suspicion standard is not a subjective one, it is worth noting that Sgt. Muollo himself did not consider the information provided by the caller sufficient to establish reasonable suspicion for an investigatory stop. See, e.g., Stone, 493 Md. at 101, 350 A.3d at 799 ("[T]he reasonable suspicion determination is a highly fact-specific inquiry, and the facts must be assessed against an objective standard."). Sgt. Muollo testified that, based on the information received from the caller, he initially intended only to approach the vehicle and talk to the occupants, and that he believed reasonable suspicion to detain the occupants of the car developed only once the driver attempted to drive away. "Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized[.]" White, 496 U.S. at 329 (citation modified). That is the case here; the tip, standing alone, did not "warrant a [person] of reasonable caution in the belief that [a stop] was appropriate[.]" Terry, 392 U.S. at 22. Because the tip contained no information that provided a nexus between the caller's observations and the belief that the occupants of the car were possibly up to illegal activity such as breaking into cars, the tip required further investigation to warrant an investigatory stop.

### C. Corroboration

We conclude that at the time that Sgt. Muollo stopped Mr. Kopp's vehicle, the tip

as corroborated by his observations did not provide reasonable suspicion that Mr. Kopp or any of the occupants of the car were engaged in criminal activity. When a tip has been received, corroborating the tipster's mere "description of a subject's readily observable location and appearance" assists an officer in "correctly identify[ing] the person whom the tipster means to accuse." J.L., 529 U.S. at 272. Corroboration of the subject's identity or existence does not, however, contribute to the reliability of the tip and is not sufficient to establish reasonable suspicion because such a tip "does not show that the tipster has knowledge of concealed criminal activity." Id. Where a tip was similar to the one in this case in that it contained only contemporaneously made observations of a person who was not engaged in any criminal activity at the time, in J.L., 529 U.S. at 268, 271, the Supreme Court concluded that even though officers were able to verify that "[t]here really was a ... [person] wearing a plaid shirt at the bus stop[,]" id. at 271, for a tip to be sufficiently reliable to furnish reasonable suspicion, the tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Id. at 272 (citation omitted).[9]

That is the shortcoming with respect to Sgt. Muollo's corroboration of the tip from his acquaintance—Sgt. Muollo arrived at an identified location and found a car fitting the

---

[9]On the other hand, in White, 496 U.S. at 327, 332, the Supreme Court concluded that a tipster's predictive information—that a woman would be leaving an apartment at a particular time and driving to a particular motel in a brown Plymouth station wagon with a broken taillight, and would be transporting cocaine—was sufficiently reliable to establish reasonable suspicion because "it demonstrated inside information—a special familiarity with respondent's affairs." What the Supreme Court found reliable about the tip in White was that officers were able to corroborate the tipster's allegations about the suspect's "future behavior," which demonstrated a familiarity with the respondent that "imparted some degree of reliability to the other allegations made by the caller." Id. at 332 (emphasis omitted).

description that the caller gave, in the location that the caller said it would be, and with people in the car as the caller said there would be. The aspects of the tip that Sgt. Muollo corroborated, however, did not furnish any indicia of reliability with respect to the tip's "assertion of illegality[.]" Id. at 272. The tip was corroborated only in its "tendency to identify a determinate person" or in this case, a car, id., but not in any way as to the reliability of the allegation of potential criminal conduct, and therefore the tip, as corroborated, did not generate reasonable suspicion for the stop.

### D. Crime in the Area

The State contends that the circuit court expressly declined to determine whether the area should be formally classified as a high-crime area under Washington, 482 Md. at 441, 443, 287 A.3d at 329, 330, and instead, in the reasonable suspicion analysis, "properly took notice of the volume of crime in the [Nancy-1] beat, without labeling it a high-crime area." Citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000), and Washington, 482 Md. at 453, 287 A.3d at 336, the State argues that the circuit court's approach was "entirely consistent with caselaw, which makes clear that the characteristics of a location—including its level of criminal activity—are valid considerations in determining whether an officer had reasonable suspicion to briefly detain someone." According to the State, "the record confirms that the 5-Nancy-1 beat did, in fact, qualify as a high-crime area under the standard set forth in *Washington*." We could not disagree more.

### 1. *Washington v. State*

To begin, it is helpful to review our holding in Washington. In Washington, 482 Md. at 453, 287 A.3d at 336, we held that, under the totality of the circumstances,

"Washington's unprovoked, headlong flight and his other evasive maneuvers in a high-crime area . . . supported reasonable suspicion for the officers to stop him and investigate further." We concluded that "Washington's unprovoked, headlong flight at the sight of police officers, his evasive actions, and his attempt to conceal himself, along with evidence establishing that this occurred in a high-crime area, were sufficient to clear" the level of suspicion required for a Terry stop. Id. at 452, 287 A.3d at 335-36.

In Washington, id. at 409, 287 A.3d at 310, two officers had been driving in what the officers testified were "high-crime areas, and enforcing drug distribution and handgun violations[,]" when the officers observed Washington and another person standing in an alley. (Citation modified). "[A]t the sight of officers who were a distance away from him in a car as he was standing in an alley, Washington fled, headlong, completely unprovoked, simultaneously with the other individual standing near him in the alley," "jumped fences, and attempted to conceal himself behind a bush to elude the officers." Id. at 449, 287 A.3d at 333.

We explained that "headlong flight is reckless, without deliberation or delay, flight lacking in calmness or restraint[,]" and agreed with the State that "'headlong' implies that the defendant was not simply leaving the area in a reasonable manner to passively avoid the police and go about one's business but, rather, the defendant was actively evading the police in a rapid, frantic, or suspicious manner." Id. at 449-50, 287 A.3d at 334 (citation modified). We described unprovoked flight as flight from officers who have not even attempted to approach a subject and in Washington's case, did not even stop their police vehicle. See id. at 451-52, 287 A.3d at 335. We explained that when an officer, without

reasonable suspicion or probable cause approaches a person, while the person "has a right to ignore the police and go about his business[,]" in an area that meets the definition of a high-crime area, "[u]nprovoked, headlong flight is a different matter, [] which may allow an inference of suspicion." Id. at 449, 287 A.3d at 334 (citation modified); see also Wardlow, 528 U.S. at 124-25.

In considering whether the circumstances were sufficient to establish reasonable suspicion, see Washington, 482 Md. at 448-49, 287 A.3d at 333, we set forth factors to be considered in determining whether an area is a high crime area. We held:

> [T]estimony concerning a location being a high-crime area must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop. Testimony must identify a location or geographic area, not an overly broad region, and particular criminal activity occurring in the not-too-distant past, to support the conclusion that the location is indeed a high-crime area. Additionally, the conduct giving rise to officers' suspicions must not be inconsistent with the nature of the crimes alleged to establish the high-crime area.

Id. at 443, 287 A.3d at 330 (citation omitted).

We concluded that the officers' testimony about the location at which Washington was stopped satisfied the conditions set forth above and "was particularized enough to establish the existence of a high-crime area as a factor supporting reasonable suspicion for Washington's stop." Id. at 443-44, 287 A.3d at 330. The officers testified about the volume and nature of crime in an area consisting of a main road and two side streets, which included the street on which Washington was stopped, and one of the officers described the number of handgun seizures on the exact block on which Washington was stopped

- 28 -

"over a three-month period in the prior year." Id. at 443, 287 A.3d at 330.

We concluded that Washington's unprovoked, headlong flight, with evasive maneuvers and attempts to conceal himself, such as jumping a fence and attempting to hide behind a bush, in an area that met the definition of a high-crime area, were factors that, under the totality of the circumstances, supported reasonable suspicion of criminal activity. Id. at 448-49, 452, 287 A.3d at 333-34, 335-36. Importantly, we held that a court may consider a person's fear of contact with police officers as a factor in the totality of the circumstances in determining whether unprovoked headlong flight in a high crime area is sufficient to establish reasonable suspicion. See id. at 407, 287 A.3d at 308-09.[10] And, we

---

[10]In Washington, 482 Md. at 407, 287 A.3d at 309, in setting forth our holding at the outset of the opinion—that the detective had reasonable articulable suspicion to stop Washington—we stated that "Washington fled, headlong, completely unprovoked, and simultaneously with the other individual standing with him in the alley." In our analysis, we concluded that the circumstances of the case demonstrated that the detective had reasonable suspicion to stop Washington, stating:

> The nature and circumstances of Washington's unprovoked flight in a location that was a high-crime area lead us to this conclusion. In this case, at the sight of officers who were a distance away from him in a car as he was standing in an alley, Washington fled, headlong, completely unprovoked, simultaneously with the other individual standing near him in the alley, fled other officers in a different car, jumped fences, and attempted to conceal himself behind a bush to elude the officers.

Id. at 448-49, 287 A.3d at 333.
We elaborated, stating that "Washington first took unprovoked, headlong flight from Detectives [], when he saw them in a police car on the street as he stood in an alley with another person" and that Washington "then engaged in unprovoked, headlong flight from [two other] Detectives [], when he saw them in a vehicle as he was fleeing from [the first two] Detectives[.]" Id. at 449, 287 A.3d at 333. We stated that "[u]nprovoked, headlong flight[,]" unlike simply ignoring police and going about one's business, "may allow an inference of suspicion[,]" and we provided definitions of the word "headlong." Id.

cautioned that our conclusion in <u>Washington</u> was "highly fact-specific[.]" <u>Id.</u> at 453, 287

A.3d at 336.[11]

Our holding in <u>Washington</u> was based in part on the holding of the Supreme Court

of the United States in <u>Wardlow</u>, 528 U.S. at 121. In <u>Wardlow</u>, <u>id.</u>, the Supreme Court

held that evidence that an individual engaged in unprovoked headlong flight in a high-

---

at 449, 287 A.3d at 334 (citation modified). In other instances, we again stated that "Washington engaged in serial unprovoked, headlong flight[.]" <u>Id.</u> at 451, 287 A.3d at 335. Moreover, we held: "That the unprovoked, headlong flight took place in a high-crime area supports the existence of reasonable suspicion." <u>Id.</u> at 452, 287 A.3d at 335.

We concluded that "Washington's unprovoked, headlong flight from police officers along with his other maneuvers were acts of evasion that contributed to a finding of reasonable suspicion for a <u>Terry</u> stop." <u>Id.</u> at 451, 287 A.3d at 334. To be sure, in resolving the question of "[w]hether unprovoked flight is to be considered a factor weighing in favor of reasonable suspicion[,]" in light of Washington's contention that "fear of police is documented among African American people and is a natural reaction[,]" we "reiterate[d] that the circumstance that unprovoked flight may be consistent with innocence is a factor that a court may take into account in determining whether officers had reasonable suspicion to detain a person, particularly a young African American man, such as Washington." <u>Id.</u> at 432-35, 287 A.3d at 324-25. In other words, we resolved that important question by concluding that "that unprovoked flight in a high-crime area does not automatically equal reasonable articulable suspicion[.]" <u>Id.</u> at 407, 287 A.3d at 309; <u>see also</u> <u>id.</u> at 434-35, 287 A.3d at 325.

[11]Specifically, we stated:

> In closing, we caution that our conclusion in this case is a highly fact-specific outcome, as the result of such analyses must always be. On the specific facts of this case—Washington's unprovoked, headlong flight and his other evasive maneuvers in a high-crime area—the totality of the circumstances supported reasonable suspicion for the officers to stop him and investigate further.

<u>Washington</u>, 428 Md. at 453, 287 A.3d at 336. In so stating, we recognized that, under the facts of the case, Washington's unprovoked, headlong flight in a high-crime area established reasonable suspicion, but that, under other circumstances, unprovoked, headlong flight in a high-crime area may result in a determination that reasonable suspicion is lacking given that unprovoked flight may be a factor consistent with innocence.

- 30 -

crime area was sufficient to furnish reasonable suspicion to stop the individual. The Supreme Court explained that its holding was consistent with the earlier holding in <u>Florida v. Royer</u>, 460 U.S. 491, 498 (1983), in which it held "that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." <u>Wardlow</u>, 528 U.S. at 125. In <u>Wardlow</u>, <u>id.</u>, quoting <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991), the Court also stated: "And any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.'" Where reasonable suspicion is lacking, a refusal to cooperate with police officers, *i.e.*, ignoring the police and going about a person's business, standing alone, does not establish reasonable suspicion. <u>See Wardlow</u>, 528 U.S. at 125. In other words, under that circumstance, an individual has a right to "go about [one's] business" and "go on one's way[.]" <u>Id.</u> at 123, 125 (citation modified).

### 2. *Our Determination with Respect to the Circuit Court's Ruling in this Case*

In this case, we conclude that for at least four reasons the circuit court erred in determining that the location of the stop was one with "a significant level of crime" and considering that determination as a factor in the reasonable suspicion analysis: (1) in testifying about crime in the Nancy-1 beat, Sgt. Muollo relied on information that was not known to him at the time of the stop; (2) it is impossible to know whether Sgt. Muollo would have determined that there was reasonable suspicion for the stop had he considered the area to be one with a significant level of crime and not a high-crime area; (3) even with the additional information obtained from the crime analyst after stopping Mr. Kopp, Sgt. Muollo's testimony was not sufficient to establish that the location was a high-crime area;

- 31 -

and (4) where an officer testifies that a seizure was warranted because an area is a high-crime area, permitting a trial court to not evaluate whether the officer's belief is reasonable and instead summarily find that the area has a different elevated level of crime and consider the finding as a factor in the reasonable suspicion analysis would enable trial courts to circumvent the high-crime area analysis set forth in Washington.

### a. Information from the Crime Analyst Obtained After the Stop

It is well settled that a determination as to whether there is reasonable suspicion to support an investigatory stop must be based on the facts and circumstances available to the officer at the time of the stop. See Terry, 392 U.S. at 21. The question is whether, under the totality of the circumstances known to the officer at the time, a reasonably prudent officer would have been justified in conducting an investigatory stop. See Trott, 473 Md. at 265, 249 A.3d at 845. An officer's testimony about a location being a "high-crime area" or there being any volume of crime in an area, like testimony concerning any other factor in the reasonable suspicion analysis, must be based on information known to the officer at the time of the stop. See Washington, 482 Md. at 443, 287 A.3d at 330.

In this case, Sgt. Muollo's testimony concerning the area being a high-crime area was based primarily on information he obtained after stopping Mr. Kopp, and, as such, cannot be used as a factor in the reasonable suspicion analysis. At the beginning of his testimony, the State asked Sgt. Muollo whether he was familiar with the Rosebay Court townhouse community before the call for service at issue and the following exchange occurred:

[THE STATE:] Is this a community that you were generally familiar with

prior to the call for service?

[SGT. MUOLLO:] Yes, I was.

[THE STATE:] How were you so familiar with it?

[SGT. MUOLLO:] Just from being a supervisor in the Fifth District Germantown. I was there for months and just familiarized myself with the area and various calls for service.

The State asked Sgt. Muollo what he understood with respect to service calls coming from the community in which 13 Rosebay Court is located and Mr. Kopp's counsel objected to use of the word "community." This resulted in the State asking Sgt. Muollo about geographical areas identified by him and others on the police force. The following exchange occurred:

> [THE STATE:] Sergeant Muollo, I want to talk a little bit about the community where 13 Rosebay Court is located. At the time that you responded to this call, are you generally familiar with calls for service coming out of this community?
>
> [SGT. MUOLLO:] Yes.
>
> [THE STATE:] What did you understand with respect to calls for service coming out the community?
>
> [SGT. MUOLLO:] I just recognize --
>
> [DEFENSE COUNSEL:] Your Honor, I would just object in terms of the word community. I think we just need more of something narrower. In case law, Your Honor, knows has identified neighborhood as something that is relatively confined and also much smaller.
>
> THE COURT: All right, just define what you mean by community so that I know when I hear community, I understand exactly what he is talking about.
>
> [THE STATE:] Sure, well, if I could inquire, Your Honor.
>
> THE COURT: Sure.

[THE STATE:] Officer Muollo, how would geographical areas identified by you and the people that you supervise on the police force.

[SGT. MUOLLO:] Absolutely, hopefully, this helps clarify. So, Germantown is the Fifth District. Every district is broken down into smaller geographical locations, which are called beats. This was the what is known [as] the 5-Nancy-1 beat. They have 5-Nancy-1, then Nancy-2 beat. They have the Mary-1, the Mary-2, the Mary-3. Those are all under, fall under the umbrella of the Fifth District. So, Rosebay Court itself falls under a smaller geographical location, which is known as the Nancy-1 beat.

[THE STATE:] And would that be the smallest geographical location or, I guess maybe, circumference that you guys typically identify communities by?

[SGT. MUOLLO:] That's the smallest one that we use generally. You would have to go, in order to get a smaller location, you would have to go specifically to a crime analyst to pinpoint, you know, an actual calls at an address or calls at a smaller location, but yes, generally, for us, it's the beat.

During the following exchange, the State asked Sgt. Muollo to describe the "5-Nancy-1" beat as a geographical area:

[THE STATE:] Sergeant Muollo, can you describe what 5-Nancy-1 is as a geographical area?

[SGT. MUOLLO:] I don't have the exact mileage, but it's just an area around the police station, around Century Boulevard, around kind of where the transit center is, and that area within, I don't have the exact mileage of that beat.

[THE STATE:] Approximately, if you can say, how many neighborhoods would be located in a single beat?

[SGT. MUOLLO:] Multiple neighborhoods. I can't, I would literally just be guessing if I took a stab at a number, but --

[THE STATE:] Okay.

[SGT. MUOLLO:] -- there are multiple neighborhoods in a beat.

- 34 -

[THE STATE:] Are you able to give a range?

[SGT. MUOLLO:] No.

The State asked Sgt. Muollo what he understood about crime in the Nancy-1 beat and Sgt. Muollo testified as follows:

[THE STATE:] Okay, so, based on the fact that Rosebay Court is located in this Nancy-1 beat, what, if anything, did you understand about crime in the Nancy-1 beat?

[DEFENSE COUNSEL:] Objection.

THE COURT: I'll overrule.

[THE STATE:] Sir, you can answer the question.

[SGT. MUOLLO:] So, rather than speculate, I reached out to our Fifth District crime analyst to get us information on that specific beat. **It was known to me as a high-crime area with a lot of calls for service in the Nancy-1 beat. It's usually very busy in that beat.** And again, I reached out to the crime analyst to provide us with specific stats on that to back that up.

[THE STATE:] And when did you reach out to that crime analyst, was that before the call for service or after the call for service?

[SGT. MUOLLO:] I reached out to the crime analyst specifically after the call for service, however, **it was already known to me prior to the call for service that that was a very busy area, a lot of calls for service, and what I would describe as a high crime area**.

\* \* \*

[THE STATE:] Sergeant Muollo, you are now, I just handed you over State's Exhibit 3 and State's Exhibit 4. Do you recognize those two exhibits?

[SGT. MUOLLO:] Yes, it's a list of calls for service provided by the Fifth District crime analyst for the year 2022 and a few for 2023 just for January, and it's all from the Nancy-1 beat.

[THE STATE:] Okay and what time period does it cover in 2023?

- 35 -

[SGT. MUOLLO:] In 2023, it covers from, it looks, appears to be beginning of January towards the end of January.

[THE STATE:] And what time period does it cover from 2022?

[SGT. MUOLLO:] All of 2022.

[THE STATE:] I'd like to just focus on January 2023 for a moment. What types of calls for service were there from January 2023 out of this Nancy-1 beat?

[SGT. MUOLLO:] Because the numbers are so high, the crime analyst just provided us with part one offenses which are the more serious crimes, such as, and it's listed on this, such as rape, burglary, assault, robbery, and then the crime analyst also added some specific of auto theft related, which was actual auto thefts, as well as, theft from vehicles.

There's robbery with a gun on here. There's weapons charges. There's sex assaults. You can see it's a wide range, and these are only part one offenses, along with auto theft and weapons offenses. It doesn't even include the numerous petty offenses that we receive calls for.

[THE STATE:] And were the calls for service represented in State's 3 and 4 part of the reason why you regarded or your Department regarded this community as a high crime area?

[SGT. MUOLLO:] Absolutely. I mean, in Exhibit 4 alone, for the year of 2022, there's, I believe, over 400 calls for service here, and these are only the more serious ones and auto theft and weapons-related ones. That number 400 does not even include all the numerous small crimes that occurred in that area.

[THE STATE:] And based on your training, knowledge, and experience, would that be a high amount of crime for a single beat?

[SGT. MUOLLO:] Yes.

[THE STATE:] Your Honor, at this time, State would move State's Exhibit 3 and State's Exhibit 4 into evidence.

[DEFENSE COUNSEL:] No objection.

THE COURT: I thought I had accepted it, but if not, 3 and 4 are received.

- 36 -

(Emphasis added).

What Sgt. Muollo purported to know about crime in the Nancy-1 beat at the time of the stop, before consulting with the crime analyst, was that the area was one that he would label a "high-crime area[,]" "with a lot of calls for service[,]" and that it is "usually very busy[.]" It is evident that Sgt. Muollo was unaware of the information contained in State's Exhibits 3 and 4 concerning calls for service in the Nancy-1 beat or the offenses that the calls were for at the time that he stopped Mr. Kopp's vehicle. Although Sgt. Muollo's initial testimony that he had familiarized himself with the beat and its various calls for service could be interpreted to mean that he had done so through his work as a supervisor in the Fifth District, Sgt. Muollo's subsequent testimony demonstrated that he had familiarized himself with the calls for service in the Nancy-1 beat, that he testified about, after the stop by contacting a crime analyst and obtaining statistics on the calls.

The State's argument that evidence concerning the overall volume of crime in an area may be used in the reasonable suspicion analysis, even if the volume is less than that of a high-crime area, is of no moment because Sgt. Muollo's testimony about the number and types of calls for service in the Nancy-1 beat was based on statistics obtained from a crime analyst after the stop. Sgt. Muollo's testimony about the level of crime in the Nancy-1 beat does not satisfy the fundamental requirement that the reasonable suspicion analysis be based on information known by a police officer at the time of the seizure. See Terry, 392 U.S. at 21-22. On this ground alone, the circuit court erred in considering that there was "a significant level of crime in the area" as a factor in the reasonable suspicion analysis.

### b.  *Significance of an Officer's Belief that a Location is a High-Crime Area*

The State's argument is essentially that where an officer testifies that an area is a high-crime area, a court may consider in the reasonable suspicion analysis that the area is one in which there is a different level of crime.  An obvious problem with the State's position is that it is not possible to know whether Sgt. Muollo, or any officer for that matter, would have taken the same action had the officer believed the area to be one with a level of crime other than that of a high-crime area, unless the officer testifies so.  The impediment to the circuit court's and the State's approach is that Sgt. Muollo testified only and unequivocally that he believed the area to be a high-crime area.  Sgt. Muollo never testified that he believed that the circumstances would have been sufficient to warrant a stop had the area not been a high-crime area, *i.e.*, had he believed the area to be one with a different or lesser level of crime.  Because Sgt. Muollo's testimony that the location of the stop is a high-crime area does not meet the threshold requirement that it be based on circumstances known to him at the time of the stop and he did not testify that the location was anything other than a high-crime area, we need not address the question of under what circumstances a court may consider, in the reasonable suspicion analysis, testimony of an officer about the level of crime in an area being less than or different from that of high crime, and, if so, the weight to be given to the testimony under the totality of the circumstances approach.

### c.  *Testimony that the Location is a High-Crime Area and Analysis Set Forth in* <u>*Washington*</u>

When an officer testifies that a location is a high-crime area and that the area being high-crime is one of the circumstances that provided reasonable suspicion for a stop,

permitting a trial court to determine, instead, without applying the analysis described in Washington, that the area is one with a different level of crime and to consider that determination in the reasonable suspicion analysis would allow trial courts to circumvent the standard for evaluating testimony regarding a location being a high-crime area and allow the type of unsubstantiated testimony about crime in an area that we sought to curtail in Washington. In Washington, 482 Md. at 441, 287 A.3d at 329, we reviewed case law involving police stops of individuals in alleged high-crime areas and concluded that while, in some instances, testimony from police officers regarding a location being a high-crime area had been sufficient "to allow a trial court to consider the high-crime nature of the location in determining the existence of reasonable suspicion for a stop[,]" we had not encountered an opportunity to "develop the necessary level of specificity" for such testimony as result of the apparent "lack of contention over a given area's high-crime status." We concluded, and today reaffirm, that because the reasonable suspicion analysis requires support from specific facts, "testimony concerning a location being a high-crime area must be particularized as to the location or geographic area at issue, the criminal activity known to occur in the area, and the temporal proximity of the criminal activity known to occur in the area to the time of the stop[,]" and "the conduct giving rise to officers' suspicions must not be inconsistent with the nature of the crimes alleged to establish the high-crime area." Id. at 443, 287 A.3d at 330 (citation omitted).

Before considering application of the factors set forth in Washington, we point out, as a threshold matter, that an officer's testimony concerning a volume of or the type of calls for service in an area, alone, is not sufficient to support a conclusion that an area is a

high-crime area.  See Washington, 482 Md. at 443, 287 A.3d at 330.  Given that a call for service is merely a call made to a law enforcement department, an area having a high volume of calls or even a high volume of particular types of calls for service, without more, does not establish that the area is a high-crime one.  See Washington, 482 Md. at 439-40, 287 A.3d at 327-28 ("'Increased calls for service and concerned business owners,' as described in officer testimony [in Sizer v. State, 456 Md. 350, 174 A.3d 326 (2017)], were insufficient to support a conclusion that the area was a high-crime area."  (Quoting Sizer, 456 Md. at 381-82, 174 A.3d at 344 (Adkins, J., concurring and dissenting) (citation modified))); see also Sizer, 456 Md. at 382 n.3, 174 A.3d at 344 n.3 (Adkins, J., concurring and dissenting) (referring to officer testimony that a call for service indicates only "that someone called the police.").

In this case, Sgt. Muollo testified solely about calls for service, which by their very nature may or may not be indicative of the occurrence of a crime.  Sgt. Muollo did not provide information about the outcome of the calls for service, such as information concerning any arrests, or crimes that are known to occur in the Nancy-1 beat or at the Rosebay Court location.[12]  Regardless of whether Sgt. Muollo's testimony had been based on information known to him at the time of the stop, which it was not, or on statistics obtained from the crime analyst, as it was, his testimony about the volume and type of calls

---

[12]According to Sgt. Muollo, the statistics from the crime analyst revealed that in 2022, there were over 400 calls for service in the Nancy-1 beat.  Sgt. Muollo testified that the types of calls that occurred in the Nancy-1 beat during January 2023, were for offenses "such as rape, burglary, assault, robbery[,] . . . actual auto thefts, as well as, theft from vehicles[,] . . . robbery with a gun[,] . . . weapons charges[,] . . . [and] sex assaults[.]"

for service in the Nancy-1 beat was not sufficient to support a conclusion that 13 Rosebay Court is a high-crime location because it indicated only that someone called the police department about a certain type of crime.

That said, we conclude that Sgt. Muollo's testimony failed to satisfy any of the factors set forth in <u>Washington</u>, 482 Md. at 443, 287 A.3d at 330, as required to establish that a stop occurred in a high-crime location as a factor in the reasonable suspicion analysis. Sgt. Muollo's testimony about the number of calls for service in the area was not particularized as to the location or geographic area at issue—13 Rosebay Court or the townhome community, the area described by the tipster—as required by our holding in <u>Washington</u>. Sgt. Muollo's testimony and the calls for service statistics that he relied on pertained to a broad geographic region known as the Nancy-1 beat. Although the exact boundaries of the Nancy-1 beat were not established, it is clear that the beat is a large geographic area of which 13 Rosebay Court and its townhome community are a small part.[13] In other words, even though Sgt. Muollo referred to a geographic area by name— the Nancy-1 beat—this was a description of a broad geographic area that was not particularized to the location at issue—13 Rosebay Court and its townhouse community.

---

[13]At the suppression hearing, Sgt. Muollo initially testified that he did not know the exact mileage of the Nancy-1 beat, that it was composed of "[m]ultiple neighborhoods[,]" and that he "would literally just be guessing if [he] took a stab at a number[.]" Later on, during cross-examination, Sgt. Muollo estimated that the beat was approximately three to four miles long and at least a "half a mile to one mile to up to maybe two miles" wide. In his brief, Mr. Kopp advises that "the beat is sprawling—it covers eight-to-ten square miles. It is bigger than the city of Annapolis." By contrast, in <u>Washington</u>, 482 Md. at 443, 287 A.3d at 330, we concluded that officer testimony about crime across a three-street radius constituted a "geographical area [that] was not overly broad[.]"

Although Sgt. Muollo testified about calls for service in the Nancy-1 beat during January 2023, his testimony failed to establish any temporal proximity between crime actually known to occur in the Rosebay Court townhouse location and the stop of Mr. Kopp's vehicle. Sgt. Muollo testified about calls for service, not "criminal activity known to occur" in the 13 Rosebay Court area or the townhouse location. Washington, 482 Md. at 443, 287 A.3d at 330. In addition, Sgt. Muollo's testimony provided no basis on which to conclude that Mr. Kopp and the other occupants of the car were "demonstrating behavior consistent with the nature of [any] crimes that led" Sgt. Muollo to conclude that the Nancy-1 beat is a high-crime area. Id. at 431, 438, 287 A.3d at 322-23, 327 (citing Sizer, 456 Md. at 358, 371, 174 A.3d at 330, 338). "To the extent that a location is alleged to be a high-crime area and this is a factor purported to support a Terry stop, the State has the burden to establish that this is so." Id. at 436, 287 A.3d at 326. In this case, Sgt. Muollo's testimony did not satisfy any of the factors described in Washington as necessary to establish the existence of a high-crime area as a factor supporting reasonable suspicion for a stop.

Moreover, where an officer testifies that a location is a high-crime area, giving the go-ahead for a trial court to forego the analysis mandated by our holding in Washington and to simply conclude that there is a different level of crime in an area as a factor supporting reasonable suspicion would not only allow a court to avoid the analysis required in Washington but would also obviate the requirement that the description of crime in an area "be based on objective and specific facts, like any factor in the totality of the circumstances analysis." Id. at 437, 287 A.3d at 326 (citation omitted).

### E. Movement of the Vehicle as Flight

The State argues that all of the factors "known to Sgt. Muollo" were sufficient "to find that reasonable articulable suspicion existed to justify Sgt. Muollo's actions in this case[,]" and that the factors include: (1) the call and that the caller's reliability was corroborated by Sgt. Muollo's observation upon arrival at the scene; (2) characteristics of the location, *i.e.*, crime in the beat; and (3) Mr. Kopp's alleged flight. Having addressed the other factors that the State asserts resulted, under the totality of the circumstances, in reasonable suspicion to stop Mr. Kopp, we turn to the issue of Mr. Kopp's alleged flight.

Relying on Wardlow, 528 U.S. at 124-26, the State argues that "[t]he Supreme Court recognized that unprovoked 'headlong' flight is highly relevant, but that does not mean less dramatic forms of evasive behavior are irrelevant." The State asserts that Mr. Kopp's decision to move his vehicle rather than submit to Sgt. Muollo's show of authority is a factor to be taken into account in the reasonable suspicion analysis. According to the State, "flight has no speed requirement" and "where a person walks away in defiance of a police officer's request to stop, persistence in walking may be considered flight."

The State brings to our attention no case law supporting the premise that the combination of a form of flight, other than unprovoked headlong flight, and its occurrence in an alleged high-crime area is sufficient to establish reasonable suspicion. We recognize that the State's argument is that there are other factors to be considered here. Nonetheless, we point out that under Wardlow, 528 U.S. at 124-25, the Supreme Court concluded that it is only unprovoked, headlong flight in a high-crime area that gives rise to reasonable suspicion for a stop—other factors such as a different level of crime in an area or flight

- 43 -

other than unprovoked and headlong are not part of the Court's holding.

The State's reliance on Wardlow for the argument that "the timing of Mr. Kopp's departure reasonably appeared evasive[,]" and "that evasive behavior is relevant in determining reasonable suspicion" is misguided. The definition of unprovoked, headlong flight and description of evasiveness in both Wardlow, 528 U.S. at 124-25, and Washington, 482 Md. at 449, 287 A.3d at 334, are in no way comparable to the movement of Mr. Kopp's car or the circumstances under which he moved the car in this case. In Wardlow, 528 U.S. at 124, the Supreme Court stated that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion[.]" The Supreme Court prefaced this statement by citing cases such as United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975), and Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (per curiam), and remarking that "[o]ur cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124. In Brignoni-Ponce, 422 U.S. at 884-85, the Supreme Court explained that a number of factors may be taken into account in determining whether there is reasonable suspicion to stop a car in a border area, including that a "driver's . . . erratic driving or obvious attempts to evade officers can support a reasonable suspicion." In this case, although Mr. Kopp's slow and brief movement of his car forward could reasonably be viewed as an attempt to not have contact with Sgt. Muollo, it cannot fairly be characterized as evasive behavior, in the sense that the term "evasive" has been described in case law finding such conduct to be a factor in the reasonable suspicion analysis.

The State's reliance on <u>California v. Hodari D.</u>, 499 U.S. 621 (1991), for the contention that Mr. Kopp's movement of the car was a show of defiance of authority, *i.e.*, a failure to submit to authority that may be considered as a factor in the reasonable suspicion analysis, is similarly misguided. Relying on <u>Hodari D.</u>, the State posits that "any conduct occurring *before* a person has submitted [to a show of authority]—such as Mr. Kopp's movement of his vehicle prompted by the presence of police—occurs before the seizure and must be considered in the totality of the circumstances supporting reasonable suspicion[.]" The Supreme Court's holding in <u>Hodari D.</u>, however, does not support the State's contention or even address the issue of whether an alleged pre-seizure failure to submit to authority may be considered as a factor that supports reasonable suspicion.

In <u>Hodari D.</u>, 499 U.S. at 623, the Supreme Court decided a single issue—whether, at the time that the defendant dropped a rock of suspected cocaine during a foot chase by a police officer, he had been "seized" within the meaning of the Fourth Amendment. The Court answered the question in the negative, holding that, to constitute a seizure of the person, there must be either the application of physical force, however slight, or, where that is absent, submission to an officer's "show of authority." <u>Id.</u> at 624, 626. The Court stated that, assuming that the officer's "pursuit in the present case constituted a 'show of authority' enjoining [the defendant] to halt, since [the defendant] did not comply with that injunction, he was not seized until he was tackled." <u>Id.</u> at 629. The Supreme Court did not determine that the officer's pursuit constituted a show of authority, let alone purport to address any issue concerning whether the defendant's failure to submit to an alleged show of authority constituted a factor that could be considered in a reasonable suspicion analysis.

We conclude that, in this case, under the totality of the circumstances, Mr. Kopp's movement of the car is a neutral factor that adds nothing to the determination of reasonable suspicion. Under the State's own version of the events, there was not reasonable suspicion for the stop until Sgt. Muollo turned on his vehicle's flashing emergency lights, after Mr. Kopp's car moved forward, meaning that up to that point, at least, Mr. Kopp was free to go. There is no allegation that, before Mr. Kopp moved the car, Sgt. Muollo had ordered Mr. Kopp to stop or directed that the car not be moved. Mr. Kopp's movement of the vehicle cannot be considered, as the State argues, the "defiance of a police officer's request to stop" or "flight." (Citation modified).

At bottom, regardless of when the stop is deemed to have occurred, the tip as corroborated by Sgt. Muollo lacked the indicia of reliability required to establish reasonable suspicion to justify the intrusion, and Mr. Kopp's movement of his car is of no consequence in the reasonable suspicion analysis. Mr. Kopp's movement of the car was the equivalent of a person, who was free to go, choosing not to engage with a police officer. See Washington, 482 Md. at 426, 287 A.3d at 320 ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business[.]" (Citation modified)). At the time that he moved the car, Mr. Kopp had a well-recognized right to decline a consensual encounter with law enforcement and "simply go on his [] way." Wardlow, 528 U.S. at 122 (citation omitted).[14]

---

[14]In its brief, the State also argues that, even if Mr. Kopp's movement of the vehicle is not considered flight, Sgt. Muollo had reasonable suspicion under the totality of the circumstances to stop Mr. Kopp based on an additional factor—that his car was illegally

### F. Other Considerations

In determining that, under the totality of the circumstances, the stop was not supported by reasonable suspicion, additional circumstances guide our decision. In assessing the reasonableness of the stop, we consider the degree of the intrusiveness attendant to the stop and the risk of harm of a decision not to stop the driver. See Terry, 392 U.S. at 24-25; Trott, 473 Md. at 268-69, 249 A.3d at 847. The risk of harm in this case amounted to the caller's belief that the occupants of the car were engaged in some type of criminal behavior, "possibly breaking into vehicles." In considering the level of intrusiveness, we note that Mr. Kopp's vehicle was blocked in on a dead-end street by police vehicles and unable to leave, with a spotlight shining on it, before Sgt. Muollo formed the belief that there were circumstances that warranted conducting an investigatory stop.

In considering the risk of harm, we are mindful that there is an undeniable public safety interest in an officer being able to follow up on and investigate a community member's tip about potential crime in an area. See Trott, 473 Md. at 270, 249 A.3d at 848. When a member of the public provides a tip, police officers must be able to go to a location and attempt to investigate. Citizen reports of potentially suspicious activity to a police

---

parked. The State contends that there is a "yellow-painted curb" and a "'no parking' sign visible at the end of the street" on Rosebay Court, where Mr. Kopp's vehicle was parked; accordingly, the State argues that Mr. Kopp was "illegally parked" at the time of the stop. However, Sgt. Muollo did not mention this in his testimony at the suppression hearing. In fact, nowhere in the record of the suppression hearing is there any mention of a yellow curb, a "no parking" sign, or an allegation of a parking violation as part of the facts and circumstances surrounding the stop of Mr. Kopp's vehicle.

department are an important aspect of ensuring public safety and are to be encouraged. It goes without saying, however, that such calls do not always provide reasonable suspicion for an investigatory stop. The actions taken by a police officer investigating such a call must be assessed in light of the public's Fourth Amendment right to be free from unreasonable searches and seizures. See Terry, 392 U.S. at 21. In this case, given the type of information provided by the tip, and the totality of the circumstances as described by Sgt. Muollo, balancing the risk of harm, *i.e.*, the public's interest in safety, against the nature of the intrusion results in the conclusion that the stop was unreasonable.

**Conclusion**

We hold that, under the totality of the circumstances, Sgt. Muollo did not have reasonable suspicion to suspect that Mr. Kopp may have been engaged in criminal activity. The tip lacked sufficient indicia of reliability to support a conclusion that criminal activity may have been occurring. When Sgt. Muollo arrived at the location at issue, he corroborated only that a car fitting the description given by the caller was parked on the street where the caller said it would be. Sgt. Muollo's testimony about calls for service in the area was not based on information known to him at the time of the stop and was not sufficient to establish the existence of a high-crime area as a factor supporting reasonable suspicion for the stop. Given the lack of circumstances giving rise to reasonable suspicion for a stop and considering that Sgt. Muollo had not directed or even asked Mr. Kopp to stop when Mr. Kopp drove his vehicle forward, the movement of the car added nothing to the reasonable suspicion analysis. Under the totality of the circumstances, the stop was not justified by reasonable suspicion.

- 48 -

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED.   RESPONDENT TO PAY COSTS.**

IN THE SUPREME COURT

OF MARYLAND

No. 34

September Term, 2025

XAVIER S. KOPP

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Concurring Opinion by Gould, J.

Filed: May 26, 2026

I agree with the Majority that the judgment of the Appellate Court of Maryland should be reversed. Viewing the evidence in the light most favorable to the State, the stop of Mr. Kopp was not supported by reasonable suspicion of criminal activity. The circumstances suggested, at most, that the car's occupants were up to no good, but that is not enough to justify a stop under *Terry v. Ohio*, 392 U.S. 1 (1968). Under the totality of the circumstances, the stop here violated the Fourth Amendment. Thus, I agree with the result reached by the Majority.

But I disagree with the Majority's analysis. In reaching its conclusion, the Majority incorrectly characterizes the function of the caller's report, discounts Montgomery County Police Detective Sergeant Peter J. Muollo's prior knowledge about crime in the area, and recasts our decision in *Washington v. State*, 482 Md. 395, 406-07 (2022), where we acknowledged that unprovoked flight, even non-headlong, could be considered in a reasonable suspicion analysis. *See id.* at 407 (concluding that "unprovoked flight in a high-crime area does not automatically equal reasonable articulable suspicion for a <u>Terry</u> stop[,]" but could be used as a "factor justifying a conclusion that criminal activity is afoot"). None of that reasoning was necessary to reach the correct result. Reasonable suspicion is assessed under the totality of the circumstances, and a fact that is innocent or insufficient standing alone may still carry weight when it is considered in context. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002). Thus, I respectfully concur in the judgment but do not join the Majority's opinion.

*The Caller's Report*

The Majority begins its analysis of "*The Call/Tip*" by stating that "[w]e must determine whether, under the totality of the circumstances, the tip from Sgt. Muollo's personal acquaintance, as corroborated by information that the Sergeant observed before stopping Mr. Kopp's vehicle, in combination with other factors, had sufficient indicia of reliability to provide reasonable suspicion." Maj. Op. at 19. In my view, there is no need to decide that question because the State did not argue that the tip, in and of itself, provided reasonable suspicion. Indeed, the Majority acknowledges five pages later that not even Sgt. Muollo believed he had reasonable suspicion for a *Terry* stop based on his friend's call.[1] Maj. Op. at 24. By his own account, his suspicion did not rise to a level he believed justified a detention until after the car began to move.

As to the caller's report, Sgt. Muollo testified:

> I received information of a suspicious black sedan parked on that street, unfamiliar to the area, occupied multiple times. It had been told to me that it had been sitting there for an extended period of time with the lights out, cell phones were going on and off in the vehicle, and the person who called me with the information advised they thought they were up to illegal activity, possibly breaking into vehicles.

---

[1] As for the relationship between Sgt. Muollo and the caller, it's inappropriate in my view to indulge speculation that they may have had a romantic relationship and to divulge the caller's address. Maj. Op. at 4 n.1 & n.2, 8. Viewing the evidence in the light most favorable to the State, the relevant point for our purposes is that they personally knew each other enough for Sgt. Muollo to believe the caller had credibility. The precise nature of their relationship, and hence Sgt. Muollo's potential bias, may have been a legitimate consideration for the suppression court, but there is no need for this Court to go there.

The Majority discounts the caller's report because it contained "no information about anticipated or future actions" of the kind present in *Illinois v. Gates*, 462 U.S. 213 (1983), and concludes that the call amounted to "no more than the caller's hunch or guess that criminal activity may have been afoot." Maj. Op. at 21. But *Gates* and *Alabama v. White*, 496 U.S. 325 (1990),[2] address tips that assert criminal activity and, as such, must be tested for reliability for that assertion. Here, however, the caller asserted no criminal activity within the meaning of *Gates* and *White*. She merely reported facts that she had observed—an unfamiliar car, parked late at night for an extended period,[3] lights out, and cell phone activity—and her concerns arising out of those facts. She did not provide a tip that a crime was occurring or about to occur, and Sgt. Muollo did not interpret her call in that way. Thus, there is no need to recast her call as the sort of "tip" that must pass the reliability test articulated in *Gates* and *White*. Credited for what it was—a report about suspicious activity in the neighborhood to which the police responded, and nothing more or less, the caller's report has a place in the totality of the circumstances analysis, even if it did not rise to the level of an actionable tip that would alone support reasonable suspicion.

Thus, the Majority's opinion today should not be read to discourage calls from concerned citizens to the police. A resident who notices something unfamiliar and concerning in her neighborhood and asks the police to investigate is doing what we should encourage residents to do. And an officer who responds to such a call is performing his job,

---

[2] *White* is also relied upon by the Majority. Maj. Op. at 1, 15, 20, 24.

[3] Within 10 minutes of that call, at approximately 9:30 pm, Sgt. Muollo responded.

3

and that too should be encouraged. That the facts did not provide reasonable suspicion for Sgt. Muollo to conduct a *Terry* stop does not mean otherwise.

*The Area's Crime Level*

The Majority's principal reason for setting aside Sgt. Muollo's testimony about the area's crime rate is that this testimony "was based primarily on information he obtained after stopping Mr. Kopp[.]" Maj. Op. at 32. Although technically correct because he was asked multiple questions about the statistics he obtained, in my view, that observation misses the point.

Sgt. Muollo testified that the area was "already known to [him] prior to the call for service[,]" that the beat[4] "was a very busy area, a lot of calls for service, and what [he] would describe as a high crime area." Moreover, he testified that he had served as a supervisor in that district for months and had familiarized himself with the area and its calls for service. While he sought statistics from a department crime analyst *after* the stop, he stated that he did so to substantiate a view he already held. This testimony notwithstanding, the Majority treats the officer's decision to confirm his belief with data as evidence that, before the call, he either lacked such a belief in the first place or had an inadequate basis to hold such a belief.

An officer is not required to carry crime statistics in his head when he acts. In my view, an officer who has formed an opinion about the character of an area based on his

---

[4] As explained by the Majority, "Sgt. Muollo testified that every district is broken down into smaller geographical locations that are called 'beats.'" Maj. Op. at 7.

4

experience and efforts to familiarize himself with the history of service calls[5] may rely on that opinion and may produce statistics at a suppression hearing to substantiate it. Had the statistics shown little crime where Sgt. Muollo claimed there was a great deal, that would have been a problem, because it would have shown that his stated belief was unfounded. But here, the statistics were consistent with Sgt. Muollo's account. The statistical data for 2022 and for January 2023, the month of the stop, matched what he testified he had already understood about the beat.

The Majority also faults the circuit court's finding of "a significant level of crime in the area[,]" reasoning that such a finding "would enable trial courts to circumvent the high-crime area analysis set forth in <u>Washington</u>." Maj. Op. at 32, 37. That criticism does not align with my understanding of *Washington*. *Washington* set out the factors a court uses to assess evidence of crime in an area: a bounded geographic area, the particular criminal activity known to occur there, and the temporal proximity of that activity to the stop. 482 Md. at 443. In *Washington*, the claim was that the area was a high-crime one, so our discussion of those factors was framed in that context. But, in my view, these factors are the means of determining the level of crime in an area, and whatever level that inquiry yields is then weighed in the totality of the circumstances for what it is worth. *Washington* does not hold that a finding short of "high crime" drops out of the analysis.

---

[5] The Majority seems to discount the relevance of service calls unless there is accompanying evidence of how often those calls lead to arrests. Maj. Op. at 39-41. But with or without arrest-rate statistics, a high volume of crime reports is indicative of a high-crime area.

In my view, a suppression court that hears testimony on geography, the types and frequency of crime, and the recency of that crime is correctly applying the *Washington* factors. On that evidence, the court may find that the area is a low-crime area, a significant-crime area, a high-crime area, or somewhere in between. Here, the circuit court weighed the evidence and found a significant level of crime, but did not feel comfortable concluding that it was a high-crime area. That was a proper use of the *Washington* factors.

The Majority offers a further reason to disregard the crime area evidence. It concludes that the beat is too broad an area to support the circuit court's finding because the beat covers multiple neighborhoods, the dimensions of which Sgt. Muollo could not state, and *Washington* calls for a bounded geographic region. Maj. Op. at 41. The geographic scope of the beat *does* bear on crime evidence, but it bears on the weight of that evidence, *see Washington*, 482 Md. at 441 (describing a decision by the District of Columbia Court of Appeals that an officer's testimony regarding a "high-crime area" "did not add much value to the analysis" because, among other things, "there was no testimony with respect to the area's boundaries" (citation modified)), and the breadth of the geographic area must be assessed against the nature of the suspected criminal activity, *see id.* at 443-44.

Drug activity tends to attach to specific streets or street corners; thus, what happens there reveals little about a quiet residential street a mile away. But burglary, auto theft, and theft from vehicles are committed by offenders who move from place to place; thus, a pattern of such crimes in one neighborhood can justify broadening the geographic lens through which the court views a different but nearby neighborhood. The crime, Sgt. Muollo

6

described, and the concern the caller expressed, involved break-ins and thefts of the mobile kind. In the context of the evidence before it, therefore, I believe that's what the circuit court was referring to when it said that "[t]o say that crime is transient is an understatement."

In sum, Sgt. Muollo's knowledge of crime in his beat was based on his own experience and observations, the circuit court did not err in considering his awareness of the crime level at the time of the stop, and the breadth of the beat, considered with the types of crime at issue, bears on the weight of that evidence.

*The Movement of Mr. Kopp's Vehicle and* Washington v. State

The Majority suggests that our holding in *Washington* limits the circumstances under which flight can be considered in a reasonable suspicion analysis to flight that is both "unprovoked" *and* "headlong." To frame the holding from *Washington* in such a light, the Majority pulls the italicized portion of the concluding paragraph of Part I of the opinion in *Washington*:

> In closing, we caution that our conclusion in this case is a highly fact-specific outcome, as the result of such analyses must always be. On the specific facts of this case—*Washington's unprovoked, headlong flight and his other evasive maneuvers in a high-crime area*—the totality of the circumstances *supported reasonable suspicion for the officers to stop him and investigate further*.

Maj. Op. at 26-27 (citing *Washington*, 482 Md. at 453 (emphasis added)).

That paragraph, however, did not announce the Court's holding, but rather applied it to the facts before us, which involved unprovoked headlong flight in a high-crime area. In doing so, we expressly cautioned that the totality of the circumstances analysis was a "highly fact-specific" inquiry. *Washington*, 482 Md. at 453.

7

The holding was articulated earlier in the opinion:

> Against this backdrop, we hold that, under the totality of the circumstances analysis, a court may consider whether unprovoked flight is an indication of criminal activity that, coupled with evidence of a high-crime area and any other relevant factors, establishes reasonable suspicion for a stop, or whether unprovoked flight, under the circumstances of the case, is a factor consistent with innocence that adds little or nothing to the reasonable suspicion analysis.

*Washington*, 482 Md. at 406-07. Similarly, we said: "In keeping with the Supreme Court's holding in <u>Wardlow</u>, we conclude that unprovoked flight in a high-crime area does not automatically equal reasonable articulable suspicion for a <u>Terry</u> stop." *Id.* at 407.

Thus, the rule we announced in *Washington* was that an unprovoked flight in a high-crime area does not automatically equal reasonable articulable suspicion for a *Terry* stop, but it remains a factor that can be considered in the totality of the circumstances analysis. We stated that holding in terms of unprovoked flight, and we did not require the additional element of *headlong* flight. To be sure, *Washington* was, on its facts, a case about headlong flight, and thus there is no shortage throughout the opinion of characterizations of Mr. Washington's flight as such. But, as the above passages from *Washington* reflect, we did not hold that something short of headlong flight in a high-crime area could never support reasonable suspicion. Whether the flight was "headlong" or not was simply not part of *Washington*'s holding.

Indeed, in *Washington*, we pointed to *Bost v. State*, 406 Md. 341 (2008), and *Sizer v. State*, 456 Md. 350 (2017), observing that in both cases we had credited a defendant's unprovoked flight as a factor in the reasonable suspicion analysis. *Washington*, 482 Md. at 451. Although both cases closely examined the specific circumstances of the defendants'

8

flight, neither *Bost* nor *Sizer* required that flight be headlong to support reasonable suspicion, and we did not characterize the flight in those cases as "headlong." *See Bost*, 406 Md. at 358-59; *Sizer*, 456 Md. at 372-74. And comparing the facts present in *Washington* with those of *Bost* and *Sizer*, we said that

> [i]n this case, because the detectives, initially, did not even stop their vehicle, much less approach [the defendant], we conclude that the unprovoked nature of the flight weighs more heavily in favor of reasonable suspicion in this case than the flight in cases such as <u>Bost</u> and <u>Sizer</u>, in which officers initially attempted to approach a defendant.

*Washington*, 482 Md. at 451-52.

Thus, *Washington* recognizes that unprovoked flight can occur in a variety of circumstances that will affect the reasonable suspicion analysis. At one end is a person who declines to engage with the police and goes about his business, conduct that adds no weight to the reasonable suspicion scale. At the other end is unprovoked, headlong flight. Conduct that falls between the two is weighed by the trial court for what it is worth. Given that *Washington* emphasized the fact-specific nature of its holding, the Majority's opinion today should not be understood to reframe *Washington* as holding that it is only headlong flight in a high crime area that can support reasonable suspicion. At bottom, whether flight can be characterized as headlong or some other way is semantics; what *is* relevant is the totality of the circumstances in each case.

### Conclusion

Here, taken together and viewed in the light most favorable to the State, the relevant circumstances for the reasonable suspicion analysis are these: a resident's report of an unfamiliar car parked for an extended period, late at night, with multiple occupants using

9

cell phones; Sgt. Muollo's corroboration of that report on his arrival, including the out-of-state tags; his knowledge that the beat had a meaningful level of crime; and the slow, brief movement of the car as he approached. Weighed together, these circumstances supported a reasonable suspicion that the occupants of the car were up to no good, but that's not enough to support a *Terry* stop. *See Terry*, 392 U.S. at 30.

For that reason, I would reverse the judgment of the Appellate Court of Maryland, but because I cannot join the Majority's reasoning, I concur in the judgment only.